**[J-96-2025, J-97-2025]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| IN RE: THREE PENNSYLVANIA SKILL AMUSEMENT DEVICES, ONE GREEN BANK BAG CONTAINING $525.00 IN U.S. CURRENCY, AND SEVEN RECEIPTS | : | No. 50 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court at No. 707 CD 2023 entered on November 30, 2023, Affirming the Lower Court Order of the Dauphin County Court of Common Pleas at No. 2022-CV-06333-MD entered on March 23, 2023 |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | ARGUED: November 20, 2025 |
| | : | |
| POM OF PENNSYLVANIA, LLC | : | No. 2 EAP 2024 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court entered on January 16, 2024, at No. 418 MD 2018. |
| v. | : | |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF REVENUE, AND CITY OF PHILADELPHIA, | : | ARGUED: November 20, 2025 |
| | : | |
| | : | |
| | : | |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF REVENUE | : | |
| | : | |

## OPINION

**JUSTICE WECHT**                                        **DECIDED: June 15, 2026**

This opinion addresses separate appeals from decisions of the Commonwealth Court, both of which concern the legal status of so-called "skill game" devices under Pennsylvania law. The Commonwealth, via the Department of Revenue, challenges the

Commonwealth Court's decision in *POM of Pennsylvania, LLC v. Department of Revenue*, 221 A.3d 717 (Pa. Cmwlth. 2019) (*en banc*) ("*POM*"), wherein the intermediate court declared that unlicensed operation of the devices is not subject to regulation under the Gaming Act.[1]   In the second appeal, the Commonwealth challenges the court's decision in *In re: Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containing $525.00 in U.S. Currency, and Seven Receipts*, 306 A.3d 432 (Pa. Cmwlth. 2023) (*en banc*) ("*Three Devices*"), wherein the Commonwealth Court concluded that the unlicensed operation of the devices also is not prohibited by Section 5513(a) of the Crimes Code.[2]

The Commonwealth Court's decisions in *POM* and *Three Devices* are the central pillars upon which rests the current state of affairs in this Commonwealth, in which "skill game" devices have been held to fall into a legal gray area outside of the reach of both the Gaming Act and the Crimes Code.  Thriving therein, the devices now may be found not only in taverns, restaurants, and social clubs, but also in mini-marts, gas stations, grocery stores, laundromats, pizza parlors, and various other establishments throughout Pennsylvania—even some dedicated solely to the purpose.  However, the Commonwealth Court's interpretation of the governing statutes, upon which the legal *status quo* wholly depends, is deeply flawed.  The Commonwealth Court was incorrect on both points.  Under a plain reading of the law, "skill game" devices are subject to both

---

[1]     Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904 ("Gaming Act").  Although the Commonwealth Court published its *en banc* decision in *POM* in 2019, the court's order was interlocutory, leaving this Court without appellate jurisdiction at that time.  The court did not enter a final, appealable order in the *POM* litigation until January 16, 2024.  The Department technically appeals from that order.

[2]     18 Pa.C.S. § 5513(a).  Throughout this opinion, otherwise-unqualified uses of "Section 5513" refer to this section of the Crimes Code.

the Gaming Act and the Crimes Code. We accordingly reverse the orders of the Commonwealth Court in both *POM* and *Three Devices*.

We recognize, as we have in the past, that many throughout Pennsylvania have placed reasonable reliance upon the Commonwealth Court's decisions on the lawfulness of the subject devices.[3] We are further mindful of the potential disturbance that our correction of the prevailing case law may cause to business owners and other good-faith participants in the industry. We thus stay our order for a period of 120 days. During this 120-day period of safe harbor, no law enforcement agency is to take adverse action against owners or operators of "skill game" devices in reliance upon this opinion.

Naturally, because all that follows is a consequence of statutory law, our General Assembly also remains free at any time to take whatever legislative action it may deem appropriate. To that end, we emphasize that our decision today does not rely upon, and does not constitute an endorsement of, any particular policy view concerning the proliferation of "skill games" throughout our Commonwealth. Determining and manifesting the "public policy" of Pennsylvania is the prerogative of the legislative branch of our government, not this judicial branch, and it is a prerogative that the General Assembly already has exercised.[4] To put it more plainly, how one feels about access to "skill games" or other types of slot machine—or about the broader legalization and

---

[3]     *See Better Bets Ventures, LLC v. Pa. Gaming Control Bd.*, 332 A.3d 1204 (Pa. 2025) (holding that Gaming Control Board may not make adverse character judgments against license applicants based solely upon participation in "skill game" industry); *id.* at 1225 ("Regardless of the legality of 'skill games' as they have proliferated in Pennsylvania, the industry that has sprung up around them involves thousands of Pennsylvanians who are under the impression that they are operating fully within the bounds of the law. They have been led to believe this through court rulings and through the representations of the device manufacturers and their lawyers. Given this landscape, it is reasonable for these individuals to believe that they are doing nothing wrong.").

[4]     *See, e.g.*, 4 Pa.C.S. § 1102 (articulating the "public policy purposes" of the Gaming Act).

normalization of gambling in our society, for that matter—is irrelevant. This is, rather, a matter of straightforward application of existing statutory law.

As discussed at length below, our General Assembly already has spoken clearly on this subject, particularly through a 2017 enactment that added new terms to the Gaming Act's definition of a "slot machine," *i.e.,* "skill slot machine" and "hybrid slot machine," which make abundantly clear that the "skill" element of the subject devices is not legally significant.[5] That is to say, as it concerns their unregulated operation in unlicensed facilities throughout Pennsylvania, it is not this Court that declares "skill games" to be unlawful. Rather, it is the General Assembly that did so nearly a decade ago. If interested parties find the application of the General Assembly's laws to be undesirable, the proper remedy lies with the same legislative body that wrote those laws. The solution is not for courts to adopt strained and untenable readings of statutes to avoid their application.

Before discussing the reasoning of the Commonwealth Court in *POM* and *Three Devices* and the errors therein, it will be helpful to set forth the relevant statutory provisions, to detail their interaction with previous case law, and to become familiar with the nature of the "skill game" devices at issue. We thus turn first to these matters, in a roughly chronological fashion.

---

[5] *See* Act of October 30, 2017, P.L. 419, No. 42, § 3 ("Act 42 of 2017"); 4 Pa.C.S. § 1103 (defining "skill slot machine" as a "slot machine in which the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game" and a "hybrid slot machine" as a "slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game.") (added by Act 42 of 2017).

## I. Background

### A. Section 5513 of the Crimes Code

As the earliest law relevant to the instant appeals, we begin with Section 5513 of the Crimes Code.[6] Section 5513 provides, in relevant part:

> **(a) Offense defined.**--A person is guilty of a misdemeanor of the first degree if he:
>
> > (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, *slot machine* or *any device to be used for gambling purposes*, except playing cards;
> >
> > (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
> >
> > (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
> >
> > (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.[7]

Section 5513(b) authorizes the confiscation and forfeiture of "[a]ny gambling device possessed or used in violation of the provisions of subsection (a)."[8]

Although Section 5513 prohibits numerous actions connected to the manufacture or operation of a "slot machine" or "any device to be used for gambling purposes," the

---

[6]     Section 5513 was an original component of the modern Crimes Code, which the General Assembly overhauled and codified through the Act of December 6, 1972, P.L. 1482, No. 334, and made effective on June 6, 1973. However, Section 5513 has statutory precursors that date back to 1860, which similarly prohibited devices used for "unlawful gaming." *See Appeal of Mills Novelty Co.*, 175 A. 548, 548-49 (Pa. 1934) (addressing Act of March 31, 1860, P.L. 398, § 60, 18 P.S. § 1445 (repealed)); *Nu-Ken Novelty, Inc. v. Heller*, 288 A.2d 919, 919-20 (Pa. Super. 1972) (same).

[7]     18 Pa.C.S. § 5513(a) (emphasis added).

[8]     *Id.* § 5513(b).

statute does not provide definitions for those terms. Section 5513 also leaves the phrase "unlawful gambling" undefined.[9] Section 5513 does, however, specify what it does *not* prohibit. Section 5513(e.1) provides a list of activities that are specifically authorized by other, later-enacted statutes, and it declares:

> **(e.1) Construction.**--Nothing in this section shall be construed to prohibit any activity that is lawfully conducted under any of the following:
>
> > (1) The act of August 26, 1971 (P.L. 351, No. 91), known as the State Lottery Law.
> >
> > (2) The act of July 10, 1981 (P.L. 214, No. 67), known as the Bingo Law.
> >
> > (3) The act of December 19, 1988 (P.L. 1262, No. 156), known as the Local Option Small Games of Chance Act.
> >
> > (4) *4 Pa.C.S. (relating to amusements).*[10]

"4 Pa.C.S. (relating to amusements)" refers to Title 4 of the Pennsylvania Consolidated Statutes. Importantly, Title 4 is the location of the Gaming Act.[11] Therefore, Section 5513(e.1)(4) makes clear that activities "lawfully conducted" under the Gaming

---

[9] The immediately preceding section of the Crimes Code, which concerns "unlawful lotteries or numbers games" provides an express definition for the word "unlawful," *i.e.*, "not specifically authorized by law." 18 Pa.C.S. § 5512(a), (d). Shortly after the enactment of Section 5513, our Superior Court concluded that the word "unlawful" in Section 5513 shares this meaning. *See Commonwealth v. Betres*, 352 A.2d 495, 498 (Pa. Super. 1975) ("There is no reason why the legislature would have intended 'unlawful' to have any different meaning in Section 5513 than it was given in Section 5512. Therefore the term 'unlawful,' as used in Section 5513 means not specifically authorized by law."). As the Superior Court there explained, this is a "reasonable common sense interpretation" of the word "unlawful." *Id.*

[10] 18 Pa.C.S. § 5513(e.1) (emphasis added).

[11] The Gaming Act is Part II of Title 4 of the Pennsylvania Consolidated Statutes, added by the Act of July 5, 2004, P.L. 572, No. 71.

Act are not unlawful under Section 5513(a), notwithstanding the latter's general prohibitions relating to a "slot machine" or "any device to be used for gambling purposes."

## B. The "Predominant Factor Test"

Long before the passage of the Gaming Act in 2004, the courts of this Commonwealth necessarily applied Section 5513 to various devices, often grappling with the meaning of the undefined phrase in Section 5513(a)(1)—"device to be used for gambling purposes"—and its more concise analog in Section 5513(b)—"gambling device." This Court developed a legal standard for that inquiry, articulated most prominently in our decision in *Commonwealth v. Two Electronic Poker Game Machines*.[12] *Two Poker Machines* addressed the question of "what constitutes a gambling device *per se*."[13] In relevant part, the Court considered whether a device called the "Electro-Sport," which simulated aspects of the gameplay of five-card draw poker, constituted a gambling device *per se*. Previous lower court decisions had reasoned that a machine is a gambling device *per se* "if it can be used for no purpose other than gambling."[14] This Court disapproved of such an approach, reasoning that, if the legal standard is to be "useful," it "cannot mean that the machine could not possibly be used for any activity other than gambling, because almost any machine, including the Electro-Sport, *can* be used for non-gambling (*e.g.*, pure amusement) purposes."[15] "Instead," the Court explained, "the inquiry

---

[12]     465 A.2d 973 (Pa. 1983) ("*Two Poker Machines*").

[13]     *Id.* at 975. *Two Poker Machines* also addressed "the distinct but related issue of the power of a court to order the seizure and forfeiture of a machine which while not a gambling device *per se* is shown to have been used for gambling purposes." *Id.* This Court concluded that such a device lawfully may be seized and subjected to forfeiture under Section 5513(b) of the Crimes Code, provided that the owner fails to prove that he was unaware of the unlawful use of the device. *See id.* at 979-81.

[14]     *Id.* at 977 (citing *Nu-Ken Novelty*, 288 A.2d at 920).

[15]     *Id.* (emphasis in original).

must be whether the machine is 'so intrinsically connected with gambling' as to constitute a gambling device *per se*."[16]

Evaluating whether a device is "intrinsically connected with gambling," this Court held, "will turn on the characteristics of the machine when read against the three elements necessary to gambling: consideration, *a result determined by chance rather than skill*, and a reward."[17] "If the machine displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se*."[18] The Electro-Sport satisfied the "consideration" and "reward" elements, but the second element—a result determined by chance rather than skill—posed "a far more difficult question."[19] Where the lower court had reasoned that the "chance" element required a finding that the game's outcome be "*entirely* a matter of chance,"[20] this Court found that standard impossibly rigid, stressing that nearly all games, even those that indisputably require significant skill and training, involve some element of luck or chance. The inquiry into what constitutes gambling, then, needed to account for "the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome."[21]

The Electro-Sport simulated aspects of poker—a game that rewards an understanding of probabilities—so it was clear that "skill, in the form of knowledge of probabilities, can improve a player's chances of winning and can maximize the size of the

---

[16] *Id.* (citing *Nu-Ken Novelty*, 288 A.2d at 920; *Friedberg Appeal*, 222 A.2d 509 (Pa. Super. 1966); *American Legion Post 51 Appeal*, 149 A.2d 483 (Pa. Super. 1959)).

[17] *Id.* (emphasis added).

[18] *Id.*

[19] *Id.*

[20] *Id.* (emphasis in original).

[21] *Id.*

winnings."[22]  Nonetheless, this Court reasoned that "chance ultimately determines the outcome  because chance determines the cards dealt and the cards from which one can draw—in short, a large random element is always present."[23]  The Court added that the Electro-Sport lacked certain elements that skilled poker players employ in the real game, such as "holding, folding, bluffing and raising."[24]  "Skill can improve the outcome in Electro-Sport; it cannot determine it."[25]

From this analysis, *Two Poker Machines* concluded that the second element of gambling was met:  "the element of chance *predominates* and the *outcome is largely determined by chance*."[26]  This legal standard for evaluating the second element of gambling—skill versus chance—has come to be known as the "predominant factor test." As our Commonwealth Court has explained succinctly, "[r]egarding the second factor, the Pennsylvania Supreme Court set forth the 'predominate factor test,' which states that, for a machine to constitute a gambling machine, it must be a game where chance predominates rather than skill."[27]  Under this test, therefore, if the skill of the player is the

---

[22]    *Id.* at 978.

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    *Id*. (emphasis added); *see also id.* at 978-79 ("[T]he Electro-Sport Draw Poker Machine manifests all three features necessary for it to be classified a gambling device *per se.*  Consideration is clearly present, chance determines the ultimate outcome despite the presence of certain skill elements, and the totality of the circumstances indicates that a reward element is present.").

[27]    *Pinnacle Amusement, LLC v. Bureau of Liquor Control Enf't*, 298 A.3d 447, 452 (Pa. Cmwlth. 2023) (citing *Two Poker Machines*, 465 A.2d at 977); *see also Three Devices*, 306 A.3d at 442-43 (discussing the predominant factor test).  We note that courts sometimes use the word "predominate" factor rather than "predominant," as the Commonwealth Court did in *Pinnacle* and in *Three Devices*.  Although we use "predominant" as the preferred adjective form, this is a distinction without a difference.

"predominant factor" that determines the "outcome" of the game, then the device is not a gambling device *per se*.

### C. The "Skill Game"

The predominant factor test provides the explanation for the existence of so-called "skill games." The idea is that, because of the presence of a skill element, the device may, per the predominant factor test, be deemed to fall outside the definition of a "gambling device" for purposes of Section 5513 of the Crimes Code, even if the use of the device otherwise bears the hallmarks of gambling. For instance, there is no dispute that individuals who use these "skill game" devices spend their money in order to play, *i.e.*, consideration, and that they do so in the hope of obtaining more money than they wager and to profit thereby, *i.e.*, reward.[28] It is solely the skill-versus-chance distinction that purports to remove the devices from the scope of Section 5513 of the Crimes Code.

In both appeals before this Court, the device at issue is called the "Pennsylvania Skill Amusement Device," which utilizes software distributed by POM of Pennsylvania, LLC ("POM").[29] Before proceeding any further, it is necessary to have some

---

[28] *See Two Poker Machines*, 465 A.2d at 977 (identifying "the three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward"); *see also POM*, Petition for Review ¶ 44 ("For purposes of this Petition only, POM does not dispute the consideration and reward elements."); *POM*, 221 A.3d at 725 ("POM also states that for the purposes of its petition it does not dispute that its game requires consideration to play and provides a reward.").

[29] *POM*, Petition for Review ¶ 1 ("POM distributes software for a skill-based video game machine, called the Pennsylvania Skill™ Amusement Device 402.49 PEN (the 'Skill Game'), throughout the Commonwealth of Pennsylvania . . . ."); ¶ 56 ("POM designs and sells the essential components of the Skill Game, which is manufactured and distributed by others.") In the record of these appeals, "POM" sometimes is used interchangeably with the affiliated entity Pace-O-Matic, Inc., a corporation organized under the laws of Wyoming with its principal place of business in Duluth, Georgia. *See Three Devices*, 306 A.3d at 436 n.2 ("The devices are electronic games developed by Pace-O-Matic, Inc."); *Three Devices*, *Amicus* Br. of Pace-O-Matic, Inc. at 1 (stating that Pace-O-Matic, Inc., *i.e.*, "POM," "developed, produced, and licenses the electronic skill games at issue in this litigation").

understanding of this device and the legal arguments regarding its features. Although certain parties before this Court take issue with each other's characterizations of various features of the device (particularly in the *Three Devices* appeal), there is no meaningful factual dispute as to its operation.[30] The device outwardly resembles a modern, electronic version of a slot machine, featuring a set of three virtually spinning reels, on which a player hopes to create winning combinations of three matching symbols. A "pay table" is displayed next to the reels, which informs the player of the potential payouts connected to each winning combination of symbols. A player inserts cash into the device, which is converted into points equal to one cent, *i.e.*, one dollar equals 100 points. The player can decide how many points to wager on a given spin, ranging from real-dollar amounts of $0.08 to $4.00 per play. The device, however, only pays out in whole dollar amounts, rounding down to the nearest whole dollar. The device allows the player to preview the upcoming spin before deciding how much to wager, but the player cannot change the outcome of the next spin, *i.e.*, it either will allow a winning combination of symbols or it will not, and the player has no control over that result.

The main gameplay contains an interactive component, but this is not the "skill" element of arguable legal significance. The "primary game" or "base game" is what POM describes as a "'Tic-Tac-Toe' style puzzle," because winning combinations of three symbols may be arranged vertically, horizontally, or diagonally, as in Tic-Tac-Toe.[31] After the player presses the "play" button and the virtual reels spin, the player can change one

---

[30]   *See Three Devices*, Trial Ct. Op., 3/23/2023, at 5 (noting that "there is no dispute as to the actual gameplay of the POM Machines"). The following account is sourced from the trial court's findings of fact as set forth in its opinion, supplemented as necessary with POM's own averments from its Petition for Review in the *POM* litigation.

[31]   *POM*, Petition for Review ¶ 14 ("The primary game the Skill Game offers is a 'Tic-Tac-Toe' style puzzle . . . ."); *Three Devices*, Appellees' Br. at 15 (referring to same as the "base game").

symbol to a "wild" symbol to create a set of three matching symbols. Thus, for instance, if a row has two matching symbols, the player can turn the third, non-matching symbol "wild" to produce a winning combination. Although the placement of the "wild" symbol creates the impression that the player is controlling the outcome, this is not the "skill" element from which the device takes its name. As the trial court in *Three Devices* found: "The puzzle portion of the game is predominately reliant on chance. Although a player has the opportunity to interact with the game to place a wild symbol, there is nothing that a player can do to ensure that the reels show a puzzle that can be correctly solved."[32] That is, each play in the base game either will allow a winning combination or it will not, and that outcome is preordained by chance.[33]

The legally relevant skill element comes into play whenever a spin in the base game produces a loss, or the player "wins" an amount less than the wager, specifically less than 105% of the amount wagered on a given spin. The player then is given the opportunity to use an additional feature called "Follow Me." "Follow Me" is a memory test reminiscent of the game "Simon."[34] The player is presented with a three-by-three grid of colored dots, which flash in a random sequence that the player must recall and reproduce. The entire exercise consists of twenty-five rounds, with each round adding another step

---

[32] *Three Devices*, Trial Ct. Op., 3/23/2023, at 8.

[33] The device also provides periodic "bonus sessions" that feature different gameplay elements, but they are not represented to this Court as constituting a legally significant "skill" element, and they are not a focus of the parties' arguments. *See POM*, Petition for Review ¶ 24 ("The bonus sessions . . . consist of a process that delivers the bonus points to a player that were already determined by the outcome of the Tic-Tac-Toe game. . . . [T]he bonus session simply is an entertaining way to deliver to the player 100% of the reward the player already earned in the Tic-Tac-Toe game.").

[34] Originally produced by the Milton Bradley Company in 1978, "Simon" is now a registered trademark of Hasbro, Inc.

that the player must remember.[35]  By the end of "Follow Me," the player must correctly reproduce a sequence of twenty-five steps.  Upon successful completion of this task, the player receives 105% of the amount wagered in the base game.  Thus, using the "Follow Me" feature, a successful player can avoid realizing a loss on any given play of the base game.

The parties to the *Three Devices* appeal differ, to say the least, as to how "Follow Me" should be characterized.  The Commonwealth contends that the feature is designed to be ignored, as "Follow Me" is not mentioned or explained in the device's general instructions, and the feature can be accessed only by clicking a cryptic and unexplained prompt—"Touch Here to Follow Me"—which appears for only a few seconds after a losing spin, and only after the option to play the base game returns.[36]  "No one walks up to these things to play 'Follow Me,'" the Commonwealth asserts, "because no one walking up even knows there *is* a 'Follow Me.'"[37]  The Commonwealth further asserts that the device discourages the use of the feature because "Follow Me" is tedious and unreasonably difficult; deliberately slows gameplay by imposing multiple "intermissions" between rounds where nothing happens for approximately fourteen seconds; takes approximately twelve minutes to complete in total, compared to mere seconds to play the base game; and awards only a few cents in excess of the player's lost wager (at most twenty cents, on a maximum bet of four dollars).[38]  Thus, the Commonwealth contends, "Follow Me" is "an obvious fig leaf, included to cloak the game's primary purpose as a gambling

---

[35]    *See POM*, Petition for Review ¶ 27 ("Follow Me" requires the player to "follow the sequences for 25 rounds of play, with each sequence adding another circle.").

[36]    *Three Devices*, Commonwealth's Br. at 11-15, 17-18, 20-21, 25, 28-37.

[37]    *Id.* at 24 (emphasis in original).

[38]    *Id.* at 37-40.

device."[39] Most pithily, the Commonwealth suggests that "'Follow Me' isn't there for the players; it's there for the lawyers."[40] That is, "Follow Me" exists to provide a legal hook for the application of the predominant factor test, to allow a conclusion that skill can control the outcome and that the device is, therefore, not a "gambling device" under Section 5513 of the Crimes Code.

The Appellees in *Three Devices*, which are businesses that share both POM's legal position and its legal counsel, take issue with the Commonwealth's characterizations of "Follow Me" and its ostensible purpose. They do not, however, challenge any particular factual representation as to how the feature operates. Rather, the Appellees emphasize that the trial court in *Three Devices* found the Commonwealth's expert witnesses to be biased in favor of finding the devices unlawful, and that the Commonwealth failed to produce adequate evidence of how players typically use the device. The Appellees, thus, strenuously oppose the Commonwealth's claim that "no one" plays "Follow Me," and they dispute the suggestion that "Follow Me" is "tedious" or "boring," particularly given its similarity to the game "Simon," which "people have been spending money on for nearly fifty years for no purpose other than the entertainment of play."[41]

We explain this all at the outset because understanding "Follow Me" is crucial to comprehending why these devices are called "skill games" in the first place, and why—according to their proponents and the Commonwealth Court—they are not, as they appear, "slot machines" or otherwise "gambling devices" for purposes of Section 5513 of the Crimes Code. The inclusion of the "Follow Me" feature into the device has sufficed to convince multiple courts that, under the predominant factor test, the outcome of gameplay

---

[39] *Id.* at 37.

[40] *Id.* at 31.

[41] *Three Devices*, Appellees' Br. at 46.

is predominantly reliant upon skill rather than chance, such that the device is not a gambling device for purposes of Section 5513. This was precisely the reasoning of the trial court in *Three Devices*, which found that, although the base game is predominantly controlled by chance, it was undisputed that "a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature."[42] Notably, despite the parties' vociferous disagreement as to what we might glean of typical gameplay or the designer's intentions for such, the trial court expressly declined to consider the common use of the device, reasoning that the owner or distributor of the device has no control over how people play it.[43] Rather, for purposes of the predominant factor test, the court found it dispositive that there is a hypothetical possibility for players to use their skill at "Follow Me" to control the outcome of every play, regardless of whether that is actually a common occurrence in the real world.

Similar reasoning prevailed in a decision of the Court of Common Pleas of Beaver County in 2014, in which the court concluded that the "Pennsylvania Skill Amusement Device" is not a gambling device for purposes of Section 5513, per the predominant factor test.[44] That decision is important not for its precedential value, but for its role in the history and development of the "skill game" industry in Pennsylvania. Following the Beaver County case in 2014, the device surged in popularity, as POM and its industry partners touted the ruling in the Beaver County case in their efforts to assure potential customers

---

[42]   *Three Devices*, Trial Ct. Op., 3/23/2023, at 8.

[43]   *Id.* at 10 ("[W]e specifically find that the question of whether these machines are games of skill or games of chance depends solely on the machines themselves and not on how a player plays them.").

[44]   *In re Pace-O-Matic, Inc. Equip., Terminal I.D. No. 142613*, M.D. 965-2013 (C.C.P. Beaver Cnty. Dec. 23, 2014) (the "Beaver County case"); *see POM*, Petition for Review ¶ 48-49 (discussing the Beaver County case and various District Attorneys' responses to the decision); *Three Devices*, Appellees' Br. at 57-58 (discussing the Beaver County case).

of the device's legality.[45]  The growing market in "skill game" devices did not escape the attention of the General Assembly, which, in 2017, made substantial revisions to the Gaming Act that significantly bear upon the disposition of these appeals.

### D. The Gaming Act and Act 42 of 2017

The Gaming Act, as originally enacted in 2004, legalized and provided a comprehensive regulatory scheme for the operation of slot machines in Pennsylvania casinos.  Although the Act first authorized only slot machines, it was expanded in 2010 to authorize table games at licensed casinos, such as poker, blackjack, roulette, etc.[46]  The Act was expanded again through Act 42 of 2017 to authorize several new forms of lawful gambling, such as "interactive gaming" and "sports wagering."[47]

---

[45]     *See Better Bets Ventures*, 332 A.3d at 1209 (recounting a "skill game" operator's explanation that he had been approached by a manufacturer with a copy of the Beaver County case in order to assure him of the legality of the "Pennsylvania Skill" device).  The website for the "Pennsylvania Skill" device, under a tab entitled "A Legal and Defendable Game of Skill," similarly emphasizes the Beaver County case as a significant court decision indicative of the legality of the device under Pennsylvania law.  *See* https://pomworks.com/paskill/pennsylvania-skill-legal/ (last visited June 8, 2026) ("In 2014, Pace-O-Matic introduced its Pennsylvania Skill game into Pennsylvania by providing a game terminal to the Pennsylvania State Police for evaluation and confirmation that it was a legal game of skill.  It was subsequently agreed to submit the game to a Pennsylvania Court to determine the legality of the game.  After reviewing the Pennsylvania Skill game, the Court of Common Pleas of Beaver County ruled that it is a legal game of predominant skill under Pennsylvania law.  The Commonwealth never appealed that decision.  Thereafter, Pace-O-Matic provided Pennsylvanians and small businesses and fraternal organizations throughout the Commonwealth with the support and entertainment of Pennsylvania Skill games.  Pace-O-Matic was, and remains, the only manufacturer of skill games who stands behind the legality of its products with a legal guarantee to indemnify operators and locations where our games are played against any claims that our games are being operated in violation of state or local laws."); *see also POM*, Petition for Review ¶ 56 ("POM stands behind the Skill Game and assures distributors and assures customers that the Skill Game is legal under state law and regulations, in Pennsylvania.").

[46]     *See* Act of January 7, 2010, P.L. 1, No. 1.

[47]     *See* Act 42 of 2017, *supra* n.5, § 25; *see* 4 Pa.C.S. §§ 13B01-13B63, 13C01-13C71.  Act 42 further authorized "fantasy contests" and "video gaming," although these (continued…)

Helpfully, the General Assembly specifically articulated its intent and objectives when drafting the Gaming Act. Most importantly, our legislature declared that the "primary objective" of the Gaming Act "to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful."[48] To that end, the General Assembly expressly declared ten separate times that it intended to authorize only "limited gaming."[49] In order to facilitate the "regulation and policing" of the "limited gaming" that it authorized, the Gaming Act established the Pennsylvania Gaming Control Board and granted it the authority to, *inter alia*, promulgate regulations, to grant licenses to casinos and other persons and entities required to be licensed under the Act, and to enforce compliance with the Act through the levying of fines, imposition of sanctions, or suspension or revocation of licenses.[50, 51]

---

provisions lie elsewhere in Title 4 of the Pennsylvania Consolidated Statutes, rather than the Gaming Act. *See* 4 Pa.C.S. §§ 301-42, 3101-4506.

[48]  4 Pa.C.S. § 1102(1).

[49]  *Id.* § 1102(2), (3), (3.1), (3.2), (4), (5), (6), (7), (8), (13).

[50]  *See Id.* §§ 1201-14.

[51]  Slot machine licenses under the Gaming Act come in several different varieties: Category 1 (for licensed racetrack facilities); Category 2 (for stand-alone casinos permitted in specified locations); Category 3 (for resort hotels); and, as of Act 42, Category 4 (for a limited number of smaller facilities to operate between 300-750 slot machines). *See* 4 Pa.C.S. §§ 1302, 1304, 1305, 1305.1. Obtaining a slot machine license is a costly endeavor. A Category 1 or Category 2 license, for instance, requires an initial licensing fee of $50 million. *See* 4 Pa.C.S. § 1209(a); *Greenwood Gaming and Entertainment, Inc. v. Department of Revenue*, 306 A.3d 319, 330 n.13 (Pa. 2023) (discussing license fees under the Gaming Act). This expense likely was intended to advance another of the ancillary objectives that the General Assembly specified in the Gaming Act, *i.e.*, "to provide a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives." 4 Pa.C.S. § 1102(3).

The Gaming Act expressly declares itself to be a carveout from the prohibitions of Section 5513 of the Crimes Code. Section 1903(a)(2) of the Gaming Act provides that the "provisions of 18 Pa.C.S. § 5513(a) are repealed insofar as they are inconsistent with this part."[52] This provision hearkens to Section 5513(e.1)(4), which reciprocally carves out lawful activities under Title 4, *i.e.*, the Gaming Act. These mutual cross-references reinforce that the "limited gaming" authorized by the Gaming Act, particularly "slot machine"[53] gaming, is lawful under Section 5513 of the Crimes Code only to the extent that it is lawful under the Gaming Act.

Importantly for present purposes, the Gaming Act provides a definition for the term "slot machine." Throughout the litigation in both appeals before this Court, the definition of a "slot machine" has provided, in relevant part, as follows:

**"Slot machine."**

(1) The term includes:

(i) Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, including the use of any electronic payment system except a credit card or debit card, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both:

(A) May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually.

(B) May utilize spinning reels or video displays or both.

---

[52] 4 Pa.C.S. § 1903(a)(2).

[53] 18 Pa.C.S. § 5513(a)(1).

(C) May or may not dispense coins, tickets or tokens to winning patrons.

(D) May use an electronic credit system for receiving wagers and making payouts.

(ii) Associated equipment necessary to conduct the operation of the contrivance, terminal, machine or other device.

(iii) *A skill slot machine, hybrid slot machine and the devices or associated equipment necessary to conduct the operation of a skill slot machine or hybrid slot machine.*[54]

"Skill slot machine" and "hybrid slot machine" were additions of Act 42 of 2017, made a part of the Gaming Act well after the Beaver County case in 2014 and after the POM devices began to proliferate in business establishments throughout Pennsylvania. The terms also are separately defined. A "skill slot machine" is a "slot machine in which the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game," and a "hybrid slot machine" is a "slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game."[55]

Given our discussion above, it should be immediately apparent that these new definitions are an unmistakable reference to the predominant factor test. Indeed, the definition of "skill slot machine" expressly uses the phrase "predominant factor." The characterizations of skill or chance affecting the "outcome" of the game are similar embodiments of the inquiry that courts conduct under the predominant factor test.[56] When combined, these definitions make clear that, for purposes of defining a "slot

---

[54]    4 Pa.C.S. § 1103 (defining "slot machine") (emphasis added).

[55]    *Id.* (defining "skill slot machine" and "hybrid slot machine").

[56]    *See Two Poker Machines*, 465 A.2d at 978 ("[T]he element of chance *predominates* and the *outcome* is largely determined by chance") (emphasis added).

machine" under the Gaming Act, it is irrelevant whether the outcome of a game is determined by skill, chance, or any combination thereof. If skill predominates, then the device is a "skill slot machine." If skill and chance both contribute to the outcome, then the device is a "hybrid slot machine." In any event, both variants of devices constitute "slot machines" under section (1)(iii) of the definition in the Gaming Act.

Arguably, any distinction between skill and chance has been irrelevant to the definition of a "slot machine" from the beginning, given that the language—"whether by reason of skill or application of the element of chance or both"—has been present in the general definition of "slot machine" since the original passage of the Gaming Act in 2004. Nonetheless, it is particularly telling that, once courts began finding that the "skill game" devices at issue are lawful to operate in unlicensed facilities under the predominant factor test, the General Assembly specifically added the definitions of "skill slot machine" and "hybrid slot machine" to the definition of a "slot machine," using language that can be understood as nothing other than an incorporation of the predominant factor test.

Although the changes brought about by Act 42 of 2017 appeared to pose a significant threat to the legal status of "skill game" devices, their proponents were not deterred. Instead, the argument became that the Gaming Act is wholly inapplicable to the devices. It was this argument that the Commonwealth Court considered, and ultimately adopted, in *POM*.

## II. Lower Court Decisions

### A. *POM*

Throughout 2017 and 2018, law enforcement officials began seizing POM's "skill game" devices from various establishments in Philadelphia, arresting employees, and seizing funds connected to the operation of the devices. These actions prompted POM to file a petition for review in the Commonwealth Court's original jurisdiction, seeking

declaratory and injunctive relief on the premise that its device is "not an illegal gambling device under Pennsylvania law," but rather is "a legal game of skill."[57]  POM named as respondents the City of Philadelphia and the Department of Revenue, contending that the latter was an interested party because the seizure of the devices deprived the Commonwealth of revenue from sales and income taxes.

The Department counterclaimed, asserting, *inter alia*, that POM's device is a "slot machine" under the Gaming Act, and that POM has been acting in violation of the Gaming Act by serving as both a "manufacturer" and a "supplier" of slot machines without having obtained the required licenses.  Further connecting the matter to an issue more in its bailiwick, the Department stressed that slot machines are subject to a heightened tax rate of 34% of their daily gross terminal revenue, and it thus was POM, not law enforcement, that was depriving the Commonwealth of tax revenue by failing to comply with the Gaming Act.[58]  The Department sought declarations to that effect, as well as an order requiring POM to remove its devices from all establishments in Pennsylvania and to cease their sale and distribution, unless and until POM obtains the proper licenses.[59]  The Department ultimately filed an application for summary relief in the nature of a motion for judgment on the pleadings with respect to its counterclaim, asking the Commonwealth Court to declare that POM's device is a "slot machine" under the Gaming Act, that POM is a "manufacturer" and/or "supplier" of slot machines under the Gaming Act, and that POM thereby is acting in violation of the Gaming Act.

---

[57]     *POM*, Petition for Review ¶ 29.

[58]     *POM*, Department's Counterclaim ¶ 23 ("Under the Gaming Act, slot machines are subject to a daily tax of 34% of their gross terminal revenue and a local share assessment.") (citing 4 Pa.C.S. § 1403(b)); ¶ 24 ("POM is not currently paying this tax, however, and is thereby violating the Gaming Act and depriving the Commonwealth, as well as the counties and municipalities in which its [devices] are situated, of revenue.").

[59]     *See POM*, Department's Counterclaim ¶¶ 51-52.

In addressing the Department's application, the Commonwealth Court first readily agreed with the Department that POM's device is, indeed, a "slot machine" under the Gaming Act. Hinting at its ultimate rationale, however, the court framed the inquiry with a caveat. The court reasoned that it first was required to determine, "if the Gaming Act applies to unlicensed slot machines," whether the device then meets that definition.[60] The court reviewed the definition of a "slot machine" in the Gaming Act, along with the definitions of "skill slot machine" and "hybrid slot machine" added by Act 42 of 2017, as discussed above.[61] Appreciating the import of those new terms, the court explained that, "if a player must primarily use skill to affect the game's result, it is considered a 'skill slot machine,'" and if "the skill of the player is not the primary factor, but outcome of the game is affected by both skill and chance, it is a 'hybrid slot machine.'"[62]

By POM's own averments in its petition, the Commonwealth Court observed, its device is "a coin-operated video machine that provides a reward of up to a combined total of 105% of the original amount spent to play," and POM did not dispute that its device required consideration and provided a reward.[63] Thus, the court reasoned:

> Because POM alleges that its game requires consideration to play, provides something of value, and is skill-based, *if POM's activities are subject to the Gaming Act*, then the POM Game fits within the definition of "slot machine" under the Gaming Act. Similarly, since POM alleges that players of the POM Game must use skill, *if the Gaming Act applies to unlicensed games*

---

[60] *POM*, 221 A.3d at 724. As the Commonwealth Court explained: "If the POM Games do not fit within the definitions, our analysis ends at this stage because the Gaming Act would not apply to the POM Game under any circumstances. On the other hand, if the POM Game does fit within the slot machine definitions, we will next determine whether the Gaming Act applies to unlicensed slot machines like the POM Game." *Id.*

[61] *See supra* nn. 54-55 and accompanying text; 4 Pa.C.S. § 1103.

[62] *POM*, 221 A.3d at 725 (capitalization modified).

[63] *Id.* (citing Petition for Review ¶¶ 13, 28, 44).

then the POM Game would fit within the definition of "skill slot machine" under the Act.[64]

For similar reasons, the Commonwealth Court opined that POM meets the Gaming Act's definitions of both a "manufacturer" and a "supplier" of slot machines. A "manufacturer" of slot machines is a "person who manufactures, builds, rebuilds, fabricates, assembles, produces, programs, designs or otherwise makes modifications to any slot machine."[65] Pursuant to POM's own representations in its petition, the Commonwealth Court concluded that, "*if the Gaming Act applies to POM's activities*," then "POM is a 'manufacturer' of slot machines because it alleges that it 'designs . . . the essential components' of the POM Game."[66] A "supplier" of slot machines is a "person that sells, leases, offers or otherwise provides, distributes or services any slot machine . . . in this Commonwealth."[67] Again, the Commonwealth Court reasoned, "*if the Gaming Act were to apply to POM's activities*, POM's factual allegations would also establish POM as a 'supplier' of slot machines," given that POM averred that it "distributes" software for, and "sells the essential components" of, the device.[68]

Having concluded that POM's device is a "slot machine" and that POM is both a "manufacturer" and "supplier" of slot machines under the Gaming Act, the Commonwealth Court turned to what it deemed to be the "one dispositive question remaining," *i.e.*, "whether the Gaming Act applies to POM's conduct."[69] This, in turn, the Commonwealth Court treated as a question of legislative intent as to whether the Gaming Act was meant

---

[64]     *Id.* (emphasis added; capitalization modified).

[65]     *Id.* (quoting 4 Pa.C.S. § 1103) (emphasis omitted).

[66]     *Id.* (emphasis added; capitalization modified).

[67]     *Id.* (quoting 4 Pa.C.S. § 1103) (emphasis omitted).

[68]     *Id.*  (emphasis added; capitalization modified).

[69]     *Id.* at 725-26.

to apply to "both legal and illegal gambling."[70]  The court looked first to several provisions of Section 1102 of the Gaming Act, *i.e.*, the "legislative intent" provision, giving particular attention to two subsections that refer to limited gaming "as authorized in this part," *i.e.*, the Gaming Act.[71]  The court further highlighted a subsection that declares the General Assembly's intent to authorize the combined operation of slot machines, table games, and interactive gaming "under a single slot machine license issued to a slot machine licensee *when* a slot machine licensee has been issued a table game operation certificate and an interactive gaming certificate under this part."[72]  From these provisions, the Commonwealth Court gathered that the "intent of the Gaming Act is to protect the public from unlawful gaming activity, enhance live horse racing, breeding programs, entertainment and employment, and to regulate **licensed** slot machines when the licensee has been issued a table game operation certificate and an interactive gaming certificate."[73]  POM's device, the Commonwealth Court declared, is "not used for any of the noted activities."[74]

The court proceeded to analyze the Gaming Act's definitions for "licensed entity," "licensed facility," "licensed gaming entity" and "slot machine licensee," all of which refer to licenses.[75]  "Thus far," the Commonwealth Court observed, "we see that a licensed entity is an entity that has **obtained a license** from the Gaming Control Board, and a licensed facility is a location where a licensed entity has been **authorized** by the Gaming

---

[70]     *Id.* at 726.

[71]     *Id.* at 726-27 (quoting 4 Pa.C.S. § 1102(2), (8)) (emphasis omitted).

[72]     *Id.* at 727 (quoting 4 Pa.C.S. § 1102(12)) (emphasis modified).

[73]     *Id.* (bold emphasis in original).

[74]     *Id.*

[75]     *Id.* (discussing 4 Pa.C.S. § 1103).

Control Board to operate slot machines."[76] The Gaming Act's stated need for licenses to conduct lawful operations, the court reasoned, stands in "stark contrast to POM's status as an unlicensed entity."[77]

The Commonwealth Court then proceeded through the classes of slot machine licenses provided in the Gaming Act,[78] which the court understood as an indication of the "type of slot machine activities the Act is intended to regulate."[79] Bolding the word "licensed" for emphasis wherever it found it, the Commonwealth Court observed that slot machine licenses are only available to licensed racetrack facilities, casinos, and resort hotels. "Clearly," the Commonwealth Court reasoned, the nature of these facilities provides an indication "that the Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines, and there is no suggestion that the Act was ever intended to apply to devices in taverns, and/or social clubs, such as the game in question."[80]

For its next ostensible clue to the General Assembly's intent, the court looked to the scope of the Gaming Control Board's authority. The Gaming Act directs the Board to "ensure the integrity of the acquisition and operation of slot machines" and grants it the "sole authority over every aspect of the authorization, operation, and play of slot machines."[81] Yet, the court emphasized that the Act also grants the Board "general and sole regulatory authority over the *conduct of gaming* and related activities *as described*

---

[76] *Id.* (bold emphasis in original; comma omitted).

[77] *Id.*

[78] *See supra* n.51.

[79] *POM*, 221 A.3d at 727.

[80] *Id.* at 728.

[81] *Id.* (quoting 4 Pa.C.S. § 1202(a)(1)).

*in this part*," *i.e.*, the Gaming Act,[82] and "conduct of gaming" is defined as the "**licensed** placement, operation and play of slot machines . . . **under this part, as authorized and approved by**" the Board.[83] The Commonwealth Court reasoned that the references to the "conduct of gaming" and the activities described in "this part" served as limitations on the Board's authority. "While these sections state that the Gaming Control Board has general and regulatory authority over slot machines, such authority must be viewed through the lens of the limiting clause stating that the Board has authority over the 'conduct of gaming,' **as described in this part** and which is defined as the **licensed** placement and operation of slot machines as **authorized and approved by the Board**."[84] The Commonwealth Court proceeded through several provisions that set forth specific powers of the Board, bolding for emphasis any use of the phrase "**licensed** entity" or "**licensed** facility."[85] Continuing in this vein, the Commonwealth Court noted that the Gaming Control Board's Bureau of Investigations and Enforcement is given the specific power to investigate licensees and license applicants, and to "inspect and examine **licensed entities**."[86] This indicated to the Commonwealth Court that, "although the Bureau has the authority to investigate and inspect licensees, permittees, and licensed entities it does not have the authority to investigate and inspect unlicensed entities."[87]

---

[82]     4 Pa.C.S. § 1202(a)(1) (emphasis added).

[83]     *POM*, 221 A.3d at 728 (quoting 4 Pa.C.S. § 1202(a)(1), 1103) (bold emphasis in original).

[84]     *Id.* (bold emphasis in original).

[85]     *Id.* at 728-29 (quoting 4 Pa.C.S. § 1207(1), (3), (9), (11), (21.1), (21.2)) (bold emphasis in original).

[86]     *Id.* at 729 (quoting 4 Pa.C.S. § 1517(a.1)(5)) (bold emphasis in original).

[87]     *Id.* at 730.

Section 1518 of the Gaming Act sets forth various prohibited acts and imposes criminal liability for violations. Although numerous subsections prohibit "any person" or "any other person" from engaging in certain actions, the Commonwealth Court concluded that these provisions likewise applied only to "licensed entities" and "licensed facilities." Section 1518(a)(3), the court noted, states that it is unlawful for "any **licensed entity** . . . or any other person to permit a slot machine to be operated, transported, repaired or opened **on the premises of a licensed facility** by a person other than a person licensed or permitted by the [Board] pursuant to this part."[88] Similarly, under Section 1518(a)(4), as the court read it, it is unlawful "for any licensed entity or other person to manufacture, supply or place slot machines into play or display slot machines **on the premises of a licensed facility** without the authority" of the Board.[89] It was from these provisions that the Commonwealth Court drew one of the more significant articulations of its central conclusion: "[A]lthough the Act makes it unlawful to place slot machines on the **premises of a licensed facility** without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an **unlicensed location**."[90] The Commonwealth Court further declared that "neither Section 1518 nor any other provision in the Gaming Act makes it unlawful for any person to manufacture, supply, or place slot machines at **unlicensed facilities** or generally unlawful to display or operate slot machines when **not authorized** by the Gaming Control Board."[91]

---

[88]    *Id.* at 729 (quoting 4 Pa.C.S. § 1518(a)(3)) (bold emphasis in original). The *POM* court omitted certain language from its quotation of Section 1518(a)(3) without noting the omissions with an ellipsis or otherwise.

[89]    *Id.* (quoting 4 Pa.C.S. § 1518(a)(4)) (bold emphasis in original). The *POM* court also omitted language from Section 1518(a)(4). The full text of this provision is provided below*, see infra* n.170 and accompanying text.

[90]    *POM*, 221 A.3d at 730 (bold emphasis in original).

[91]    *Id.* at 732. (bold emphasis in original; capitalization modified).

The Commonwealth Court insisted that the Department's legal position required a determination that the Gaming Act regulates "both legal and illegal gambling."[92] Illegal gambling, the court reasoned, is the purview of Section 5513 of the Crimes Code, and, per Section 1903(a)(2) of the Gaming Act, Section 5513 is only repealed to the extent that it is "inconsistent with" the Gaming Act.[93] In the Commonwealth Court's view, this raised a question as to "whether the General Assembly intended for the Gaming Act to comprehensively regulate all gambling in the Commonwealth and, thus, apply to both legal and illegal gambling."[94] Ultimately, the Commonwealth Court determined that "the Gaming Act does not apply to unlicensed and/or illegal slot machines."[95] The court opined:

> [T]he Gaming Act was intended to license slot machine operations at racetracks, casinos, hotels, and established resort hotels. Thus, its intent was to provide licenses to large, individual slot machine operations that raise millions of dollars in revenue. The POM Games are not located at any of these types of facilities and there is absolutely no suggestion in these provisions of the Gaming Act, or any other provisions of the Act, that the Gaming Act was intended to apply to the facilities where the POM Games are located, *e.g.*, taverns and social clubs, or that the Gaming Act regulates the placement of slot machines at such facilities.[96]

The court then reiterated much of its earlier analysis, which it used to support its conclusion that "the Gaming Act specifically regulates **licensed** slot machines in **licensed** facilities."[97] The Commonwealth Court proceeded again through many of the above-

---

[92]    *Id.* at 730.

[93]    *See supra* n.52 and accompanying text.

[94]    *POM*, 221 A.3d at 730.

[95]    *Id.* at 731.

[96]    *Id.*

[97]    *Id.* (bold emphasis in original).

discussed statutory provisions, again boldfacing for emphasis numerous uses of the word "licensed," "authorized" or "approved" by the Board, etc.[98]  "Due to the language in the Gaming Act discussing the regulation of licensed slot machines and facilities," the Commonwealth Court declared that it "simply cannot glean any intention by the General Assembly for the Gaming Act to regulate all unlicensed and illegal slot machines in the Commonwealth."[99]

The Commonwealth Court further sought to bolster its conclusion with a discussion of legislative history.  The court quoted a legislator's floor statement in 2004, in which he defended the bill that would become the Gaming Act from an accusation that the original purpose of the bill changed.[100]  From this, the Commonwealth Court gathered that the Gaming Act's intent always was to raise revenue to support the horse-racing industry, and the "legislative history does not demonstrate that the General Assembly intended for the Gaming Act to regulate all unlicensed and/or illegal slot machines then existing in the Commonwealth."[101]  In a similar vein, the Commonwealth Court noted that, during the debate on the bill that would become Act 42 of 2017, the prime sponsor of the bill, Representative Jason Ortitay, was asked whether he "believes that the language in this bill will make illegal all games of skill in the [Commonwealth] of Pennsylvania that currently exist, all the ones that exist currently at truckstops and convenience stores and social

---

[98]     *See id.* at 731-33.

[99]     *Id.* at 733.

[100]     *See generally* PA. CONST. art. III, § 1 ("No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.").

[101]     *POM*, 221 A.3d at 734*.*

clubs." Representative Ortitay replied: "I do not believe so, Mr. Speaker."[102] The Commonwealth Court took this as another indication that "that unlicensed slot machines and/or slot machines that are not approved by the Gaming Control Board, such as the POM Game, are not subject to the Gaming Act."[103]

Finally, the Commonwealth Court opined that its conclusion was "enhanced by an analysis of whether the General Assembly intended the Gaming Act to supplant the Crimes Code's regulation of unlicensed slot machines and illegal gambling devices."[104] The court turned to a discussion of the judicial presumption against the implied repeal of statutes.[105] The Commonwealth Court suggested that the Department's position would necessitate a conclusion that the Gaming Act "establishes a uniform system for all gambling" in Pennsylvania, whether legal or illegal, which "would effectively supersede and displace" the prohibition of illegal gambling in Section 5513(a) of the Crimes Code.[106] Yet, the Commonwealth Court claimed, "there is nothing in the Gaming Act that suggests that it purported to revise all statutes governing illegal gambling, set up a general or exclusive system covering the entire subject matter of gambling, or establish a uniform and mandatory system encompassing all gambling."[107] Given the "strong presumption against implied repeals of statutes and the lack of an irreconcilable conflict" between the Gaming Act and Section 5513, the Commonwealth Court declared that it would "decline

---

[102]    *Id.* at 734 (quoting Legislative Journal—House, 201st Sess., Oct. 25, 2017, at 1174) (bold emphasis omitted).

[103]    *Id.* at 734-35 (emphasis omitted).

[104]    *Id.* at 735.

[105]    *Id.* at 735-36.

[106]    *Id.* at 736.

[107]    *Id.*

to conclude that the Gaming Act impliedly repealed the Crimes Code's regulation of illegal gambling devices and slot machines."[108]

Accordingly, the Commonwealth Court concluded that "the plain language of the Gaming Act indicates that the General Assembly did not intend for the Gaming Act to regulate unlicensed slot machines which fall outside the ambit of the licensed facilities clearly delineated by the Gaming Act, and/or supplant the Crimes Code's regulation of the same."[109]  Thus, the court opined, "the POM Game is not subject to the Gaming Act."[110]  The court thus denied the Department's application for summary relief.

---

[108]    *Id.*

[109]    *Id.*

[110]    *Id.*  Because the Commonwealth Court concluded that the Gaming Act does not apply to the POM device, it rejected POM's suggestion that the Department failed to join the Gaming Control Board as an indispensable party to its counterclaim.  The court noted that an analysis of whether a party is indispensable turns upon whether the party has "a right or interest related to the claim."  *Id.* at 736 n.18.  Having concluded that the device is not subject to the Gaming Act at all, the Commonwealth Court reasoned that "the Gaming Control Board has no regulatory authority regarding the POM Game," and, thus, "does not have a right or interest" related to the litigation.  *Id.*

Because "the failure to join an indispensable party implicates a court's subject matter jurisdiction," *Simone v. Alam*, 333 A.3d 359, 364 (Pa. 2025), our disagreement as to the applicability of the Gaming Act may raise a jurisdictional question for the Commonwealth Court.  However, as the appeal arrives before this Court, the Gaming Control Board is not an indispensable party to the litigation precisely because of the Commonwealth Court's determination on the applicability of the Gaming Act, the merits of which we review at present.  It is not until after this Court reverses the Commonwealth Court's decision on the merits, for the reasons that follow, that the question of the Gaming Control Board's status as an indispensable party again becomes relevant.  Accordingly, we decline at this juncture to vacate the Commonwealth Court's ruling on jurisdictional grounds or otherwise to dispose of this appeal without a merits ruling, because the determination of the Gaming Control Board's interest is inseparable from a ruling on the merits of the Commonwealth Court's rationale.  Additionally, given the protracted nature of this consequential litigation and the fact that it took several years before the Commonwealth Court produced a final, appealable order for this Court's review, it would be a disservice to our law to allow more time to elapse without a conclusive ruling on the application of the governing statutes to the subject devices.  We leave any outstanding questions of jurisdiction or indispensable-party status to the lower court on remand.

## B. *Three Devices*

Despite repeatedly referring to the device at issue as an "illegal slot machine,"[111] the Commonwealth Court in *POM* expressly left open the question of whether unlicensed operation of the device is prohibited under Section 5513 of the Crimes Code.[112]  The Commonwealth Court, again sitting *en banc*, would confront that question in *Three Devices*.

On December 9, 2019, agents of the Pennsylvania State Police, Bureau of Liquor Control Enforcement seized three POM devices from Champions Sports Bar in Dauphin County, along with a green bag containing $525.00 in currency and seven receipts.  The devices had been provided to the bar by Capital Vending Company, Inc.[113]  The agents contended that the POM devices were illegal gambling devices under Section 5513(a) of the Crimes Code, and that the cash and receipts were derivative contraband.  No criminal charges were filed as a result of the seizure, but the Commonwealth sought forfeiture of the seized items under Section 5513(b) and issued an administrative citation to the bar for permitting unlawful gambling on its premises.

The Appellees filed a petition for return of property in the Dauphin County Court of Common Pleas,[114] contending that the devices are not unlawful under Section 5513(a) of

---

[111]  *POM*, 221 A.3d at 730, 731, 732, 733, 734, 736.

[112]  *See id.* at 735 n.17 ("Of course, we do not answer the separate question of whether the POM Game qualifies as an illegal gambling device under [S]ection 5513 of the Crimes Code, which both parties appear to acknowledge presents a question of fact that requires factual discovery to resolve.").  The *POM* court did not comment upon the fact that Section 5513(a)(1) also applies to a "slot machine."

[113]  The Commonwealth collectively referred to Champions Sports Bar, LLC, and Capital Vending Company, Inc., as the "Appellees."  Because they remain the appellees in the instant appeal, we will use the same designation.

[114]  *See* 42 Pa.C.S. § 5806; Pa.R.Crim.P. 588 (providing for motions for return of property).

the Crimes Code because they are predominantly games of skill, not chance. The trial court held a series of evidentiary hearings at which the parties presented dueling expert opinions as to the proper classification of the devices. As we discussed above while detailing the operation and features of the devices,[115] the trial court ultimately concluded that, per the predominant factor test, the devices are not unlawful gambling devices under Section 5513. The court ordered the seized property to be returned to the Appellees.

On appeal to the Commonwealth Court, the Commonwealth asserted two separate grounds to conclude that the devices are unlawful under Section 5513(a)—that they are "slot machines" for purposes of that subsection, or alternatively that they are otherwise "gambling devices *per se*" under the predominant factor test.[116] Again, Section 5513(a)(1) provides that a person is guilty of a first-degree misdemeanor if he "intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, *slot machine* or *any device to be used for gambling purposes*, except playing cards."[117]

As it concerned the classification of the POM device as a "slot machine," the Commonwealth Court "readily" rejected the Commonwealth's arguments.[118] The court stressed that the term "slot machine" is not defined in the Crimes Code. Looking to a dictionary definition, the court stated that a "slot machine is commonly construed as a 'coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle,'" or "electronic version[s] of the machine."[119] The

---

[115]   *See supra* Part I(C) of this opinion.

[116]   *Three Devices*, 306 A.3d at 436.

[117]   18 Pa.C.S. § 5513(a)(1) (emphasis added); *see also supra* Part I(A) of this opinion.

[118]   *Three Devices*, 306 A.3d at 440.

[119]   *Id.* (citing Merriam-Webster's online dictionary definition for "slot machine," https://www.merriam-webster.com/dictionary/slot%20machine).

Commonwealth Court claimed that the POM device does not fit within this definition. Referring to the "base game" or what POM calls the "Tic-Tac-Toe style puzzle," the Commonwealth Court acknowledged that the "first stage in gameplay may be analogous to the experience that a slot machine offers."[120] Nonetheless, referring to the "Follow Me" feature, the court reasoned that the devices "also integrate a memory game into the overall gameplay experience that requires a player to focus on a sequence of multicolored shapes and then recall the sequence correctly"—an "additional feature" of the POM devices that "distinguishes them from the common definition of a slot machine."[121]

The Commonwealth also contended that the term "slot machine" should be read *in pari materia*[122] with the Gaming Act, which, as we have seen, provides a definition for a "slot machine." The Commonwealth Court rejected the suggestion, reasoning that statutes are *in pari materia* when they "relate to the same persons or things or to the same class of persons or things."[123] "Here," the Commonwealth Court declared, "the statutes do not relate to the same class of things: the Crimes Code regulates illegal gambling devices, and the Gaming Act regulates licensed gambling in the Commonwealth."[124] Regardless, the Commonwealth Court reasoned, the rule of *in pari materia* construction should be invoked only where statutory language is ambiguous, and the court did not

---

[120] *Id.*

[121] *Id.*

[122] "*In pari materia*" refers to "a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." *In pari materia*, BLACK'S LAW DICTIONARY (12 ed. 2024). Under our Statutory Construction Act, "[s]tatutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things," and "[s]tatutes *in pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932(a)-(b).

[123] *Three Devices*, 306 A.3d at 440 (quoting 1 Pa.C.S. § 1932(a)).

[124] *Id.*

"discern any ambiguity" in the use of the term "slot machine" in Section 5513(a)(1).[125] That is, according to the Commonwealth Court, a "slot machine" in Section 5513(a)(1) unambiguously refers to the common meaning of the term found in the dictionary definition that the court cited, and it is therefore unconnected to the definition of a "slot machine" provided in the Gaming Act. In any event, because Section 5513 is a penal statute, the court stated that any ambiguity therein should be resolved in favor of the accused.[126] In sum, the Commonwealth Court concluded, "the POM machines are not slot machines as commonly defined," and the court declined to "import a broad definition used to regulate legal gambling into this criminal statute."[127]

The separate question of whether the device otherwise constitutes a "device to be used for gambling purposes,"[128] *i.e.*, a gambling device *per se*, necessitated the application of the predominant factor test.[129] The Commonwealth Court reviewed the evidence presented to the trial court concerning the operation of the POM devices, the trial court's findings of fact, and its credibility determinations. Most important to the Commonwealth Court, as it was to the trial court, was the agreement among all of the parties' witnesses that, hypothetically, "a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature."[130] Thus, even though the base game is "predominantly a game of chance," the Commonwealth Court agreed with the trial court that "the fact that the Follow Me feature

---

[125] *Id.* (citing *Goodwin v. Goodwin*, 280 A.3d 937, 948 n.7 (Pa. 2022)).

[126] *Id.* at 441 (citing *Commonwealth v. McCoy*, 962 A.2d 1160, 1168 (Pa. 2009)).

[127] *Id.*

[128] 18 Pa.C.S. § 5513(a)(1).

[129] *See supra* Part I(B) of this opinion; *Three Devices*, 306 A.3d at 442-43 (discussing the predominant factor test).

[130] *Three Devices*, 306 A.3d at 445 (quoting Trial Ct. Op., 3/23/2023, at 8).

could be won every time and showed up every time a player won less than 105% of the amount played eliminated the chance element."[131]   Accordingly, the Commonwealth Court found no legal error in the trial court's application of the predominant factor test and its resultant conclusion that the POM device is not a gambling device *per se.*

Because it found that the POM device is not a "slot machine" or a gambling device *per se* for purposes of Section 5513 of the Crimes Code, the Commonwealth Court affirmed the trial court's order to return the seized property.

## III. Issues and Legal Standards

Because the litigation in *POM* was commenced in the Commonwealth Court's original jurisdiction, the Department of Revenue in *POM* appealed directly to this Court, once the Commonwealth Court issued a final, appealable order on January 16, 2024.[132] The Department raises the following question for our review in the *POM* appeal:

> Did the Commonwealth Court erroneously conclude that the Gaming Act does not regulate unlicensed slot machines despite specific statutory provisions prohibiting a person from manufacturing or supplying a slot machine without a license?[133]

---

[131]   *Id.*

[132]   *See* 42 Pa.C.S. § 723(a) ("The Supreme Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court . . . .").   We note that this Court quashed an earlier notice of appeal in the *POM* litigation on July 21, 2023, which was necessitated by the absence of a final order of the Commonwealth Court at that time. *See POM of Pennsylvania, LLC v. Dep't of Revenue*, 297 A.3d 1294 (Pa. July 21, 2023) (*per curiam*) (citing, *inter alia*, 42 Pa.C.S. § 723(a); Pa.R.A.P. 341(b) (defining a final order)).

[133]   *POM*, Department's Br. at 7.

The appeal in *Three Devices* arrived before this Court from our grant of *allocatur*, as the proceedings there originated in the Court of Common Pleas.[134] In *Three Devices*, the Commonwealth raises the following questions:

(1)    Does an electronic slot machine cease to be an illegal "gambling device," governed predominantly by chance, if the machine's manufacturers embed into its programming a so-called "skill" element that is almost entirely hidden from view and is almost impossible to complete?

(2)    Should gambling statutes governing "slot machines" be read *in pari materia* to supply an appropriate definition of the term?[135]

Both appeals before this Court turn upon questions of statutory interpretation. Statutory interpretation is a pure question of law over which our scope of review is plenary and our standard of review is *de novo*.[136] As in all such matters, we are guided by our Statutory Construction Act,[137] pursuant to which the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly."[138] "Generally, the plain language of the statute provides the best indication of legislative intent."[139] To that end, the Statutory Construction Act demands that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."[140] Only when "the words of the statute

---

[134]    *See* 42 Pa.C.S. § 724(a).

[135]    *Three Devices*, 320 A.3d 673 (Pa. June 18, 2024) (*per curiam*).

[136]    *Commonwealth v. Linton*, 337 A.3d 467, 474 (Pa. 2025) (quoting *Commonwealth v. Gamby*, 283 A.3d 298, 304 (Pa. 2022)).

[137]    1 Pa.C.S. §§ 1501-1991.

[138]    *Id.* § 1921(a).

[139]    *Commonwealth v. Crosby*, 329 A.3d 1141, 1149 (Pa. 2025) (quoting *Commonwealth v. Kingston*, 143 A.3d 917, 922 (Pa. 2016)) (internal quotation marks omitted).

[140]    1 Pa.C.S. § 1921(b).

are not explicit" may a court proceed to consider other indicia of legislative intent.[141] We must presume, *inter alia*, that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," that it "intends the entire statute to be effective and certain," and that it "intends to favor the public interest as against any private interest."[142] Statutes "are *in pari materia* when they relate to the same persons or things or to the same class of persons or things," in which case they "shall be construed together, if possible, as one statute."[143]

## IV. Analysis

It is the combination of the Commonwealth Court's reasoning in *POM* and *Three Devices* that accounts for the present legal status of so-called "skill games" as lying beyond the reach of both the Gaming Act and the Crimes Code. Under *POM*, the Gaming Act purportedly is inapplicable to the devices, to their unlicensed operators, or to the unlicensed locations in which they are operated, but *POM* left open that the devices nonetheless may be subject to Section 5513 of the Crimes Code. *Three Devices* closed that door when it reasoned that the devices fall outside the scope of Section 5513 as well. Slot machines once were confined to casinos (*i.e.*, "licensed facilities") under the Gaming Act. However, in the wake of the Commonwealth Court's decisions, slot machines—or devices that are identical to slot machines in appearance, operation, and function—may be used anywhere throughout this Commonwealth, and neither the Gaming Act, the Crimes Code, nor any authority responsible for enforcing those laws has any say over the matter. No one has explained why the General Assembly should be presumed to have

---

[141]    *Id.* § 1921(c).

[142]    *Id.* § 1922(1), (2), (5).

[143]    *Id.* § 1932(a), (b).

intended this unusual state of affairs, particularly in the face of numerous statutory provisions that suggest the contrary intent.

### A. The Commonwealth Court's Reasoning

The Commonwealth Court's legal paradigm produces numerous incongruities, not least of which is the fact that the POM device has been declared to be simultaneously a "slot machine" and not a "slot machine."[144] This contradiction is emblematic of the central error in the Commonwealth Court's reasoning: the court viewed the Gaming Act and the Crimes Code as islands unknown to each other rather than a unified statutory scheme. According to the *Three Devices* court, the Gaming Act and the Crimes Code do not even "relate to the same class of things" because the Gaming Act concerns *legal* gambling and the Crimes Code concerns *illegal* gambling.[145] To the contrary, these are not two entirely different subjects, but rather two sides of the same coin. As discussed above, the Gaming Act and Section 5513 of the Crimes Code work in tandem to identify the scope of lawful gambling activities, particularly as it concerns the lawful operation of slot machines. The statutes make this clear through their mutual cross-references.

Inexplicably, the court in neither *POM* nor *Three Devices* took note of Section 5513(e.1)—a subsection that holds the key to understanding the entire statutory scheme.[146] Generally speaking, Section 5513(a) prohibits gambling in this Commonwealth, and it specifically addresses activities relating to a "slot machine."[147] Section 5513(e.1), however, provides a carveout for activities that are "lawfully

---

[144]  *See POM*, 221 A.3d at 724-25; *Three Devices*, 306 A.3d at 439-41.

[145]  *Three Devices*, 306 A.3d at 440; *see also POM*, 221 A.3d at 726, 730 (rejecting the suggestion that the Gaming Act applies to "both legal and illegal gambling").

[146]  18 Pa.C.S. § 5513(e.1). *See supra* n.10 and accompanying text for the complete language of Section 5513(e.1).

[147]  18 Pa.C.S. § 5513(a)(1).

conducted" under other statutory authorities, namely, the Gaming Act.[148]  The Gaming Act reinforces its symbiotic relationship with Section 5513 through a reciprocal cross-reference in Section 1903(a)(2), which provides that the provisions of Section 5513(a) are repealed, but only insofar as they are "inconsistent with" the Gaming Act.[149]  This indicates that the Gaming Act takes priority in determining what is lawful thereunder, but that the provisions of Section 5513(a) otherwise remain in effect.  Together, Section 5513(e.1)(4) of the Crimes Code and Section 1903(a)(2) of the Gaming Act create a unified scheme.  Stated simply, activities that are "lawfully conducted" under the Gaming Act are therefore not prohibited under the Crimes Code,[150] but an activity that is *not* lawful under the Gaming Act remains subject to Section 5513(a) of the Crimes Code.

Thus, to take the Commonwealth's challenge in *Three Devices* first, the Commonwealth Court erred in viewing the term "slot machine" in Section 5513(a)(1) as having a meaning wholly unrelated to the definition of a "slot machine" provided in the Gaming Act.[151]  As the Commonwealth asserts, the court's error could be understood as a failure to read the statutes *in pari materia*, premised upon an unreasonably rigid distinction between legal and illegal gambling as constituting a different "class of things."[152]  To the contrary, the Gaming Act and Section 5513 of the Crimes Code do

---

[148]    *Id.* § 5513(e.1)(4).

[149]    4 Pa.C.S. § 1903(a)(2).

[150]    18 Pa.C.S. § 5513(e.1)(4).

[151]    *Three Devices*, 306 A.3d at 441 (reasoning that "the POM machines are not slot machines as commonly defined, and we decline to import a broad definition used to regulate legal gambling into this criminal statute").

[152]    *Id.* at 440  ("Statutes are *in pari materia* 'when they relate to the same persons or things or to the same class of persons or things.'  Here, the statutes do not relate to the same class of things: the Crimes Code regulates illegal gambling devices, and the Gaming Act regulates licensed gambling in the Commonwealth.") (quoting 1 Pa.C.S. § 1932(a); citation omitted).

indeed relate to the same "things" or to the "same class of persons or things."[153]   Both statutes relate to gambling, and particularly concern the use of slot machines.  More importantly, however, given the express cross-referencing in the statutes, reading the term "slot machine" in Section 5513(a)(1) alongside the definition of that term in the Gaming Act is not even truly an instance of using the *in pari materia* rule as a canon of statutory construction.  Rather, it is simply applying the plain language of the statutes.  Section 5513(a)(1) sets forth criminal prohibitions relating to slot machines, and Section 5513(e.1)(4) unambiguously tells us to look to the Gaming Act to determine whether activities concerning slot machines are "lawfully conducted."  To conclude, then, that the definition of a "slot machine" in Section 5513(a)(1) has nothing to do with the definition of a "slot machine" in the Gaming Act requires an unduly cramped reading of the statutory scheme.

We turn, then, to the Gaming Act and its applicability to POM's "skill game" device.  The Commonwealth Court in *POM*, although recognizing that the device constitutes a "slot machine" (or, perhaps, a "skill slot machine") under the definition provided in the Gaming Act, nonetheless concluded that the Gaming Act was inapplicable due to "POM's status as an unlicensed entity."[154]  Although the court proceeded at length to emphasize the frequent use of the word "licensed" in the Gaming Act, the court's reasoning reduces to a simple proposition:  that the Gaming Act only "regulates licensed slot machines in licensed facilities."[155]  Therefore, the argument goes, because the Gaming Act "only

---

[153]    1 Pa.C.S. § 1932(a).

[154]    *POM*, 221 A.3d at 727.

[155]    *Id.* at 731 (emphasis omitted).

applies to licensed slot machines in licensed entities/facilities," the *POM* court asserted that it "does not apply to unlicensed and illegal devices," such as the POM device.[156]

Assuming, *arguendo*, that the Commonwealth Court was correct about the scope of the Gaming Act, its suggestion leads to a uniquely peculiar outcome. It is true, in a general sense, that the Gaming Act concerns licensing for an activity that otherwise is unlawful (specifically, activity that is unlawful under Section 5513 of the Crimes Code, as we have seen). Indeed, such is the very purpose of a "license," *i.e.*, to obtain permission to do something that is otherwise impermissible.[157] Yet, the *POM* court's reasoning suggested that, precisely because the law governing licensing is addressed to the licensed activity, one need not be concerned with that law so long as one does *not* obtain a license. Thus, one is free to do the licensed activity without a license. But this, as should be obvious, subverts the entire purpose of a license.

Again, as it concerns "slot machines," it is worth reiterating that the *POM* court did not rely upon any distinction between the elements of skill and chance (and could not after Act 42 of 2017), but rather concluded that, as far as the Gaming Act is concerned, "slot machines" may be operated without a license anywhere throughout Pennsylvania.[158] By the *POM* court's reasoning, although casinos must comply with an extensive licensing and regulatory scheme under the Gaming Act and the Gaming Control Board's

---

[156]     *Id.* at 733.

[157]     *See license*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("1. A privilege granted by a state or city upon the payment of a fee, the recipient of the privilege then being authorized to do some act or series of acts that would otherwise be impermissible. 2. A permission, usu. revocable, to commit some act that would otherwise be unlawful . . . . 3. The certificate or document evidencing such permission.").

[158]     *See, e.g.*, *POM*, 221 A.3d at 730 ([A]lthough the Act makes it unlawful to place slot machines on the premises of a licensed facility without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an unlicensed location.") (emphasis omitted).

regulations, one could take all the slot machines out of a casino, set them up in one's backyard, and proceed to operate an *unlicensed* casino. So long as one *does not* obtain a license, the Commonwealth Court reasons, one need not comply with the Gaming Act, because that law concerns only *licensed* activity. It is true that the Commonwealth Court, in a single footnote, left open the possibility that such actions may violate Section 5513 of the Crimes Code[159]—a possibility that remained until the *Three Devices* case. Yet, as it concerns so-called "skill games," the tenor of the *POM* court's decision suggested that there is nothing impermissible at all about their unlicensed operation in unlicensed facilities. And this is precisely how the proponents of such devices have understood the Commonwealth Court's ruling.

Beyond the absurdity of this implication, the Commonwealth Court in *POM* also was simply wrong. The plain language of the Gaming Act reveals that it is not strictly limited to "licensed entities" and "licensed facilities." The Gaming Act's broader scope is apparent even in the provisions that the *POM* court cited. For instance, the definitions that the Gaming Act provides for "manufacturer" and "supplier," which the *POM* court quoted in part, plainly cover the manufacture and supply of slot machines "in this Commonwealth," not only with respect to those slot machines destined for "licensed facilities" or to be used by "licensed entities."[160] A "manufacturer license" and "supplier license" similarly are defined in terms of the manufacture and supply of slot machines "for

---

[159]    *See id.* at 735 n.17.

[160]    *See* 4 Pa.C.S. § 1103 (defining "manufacturer" as a "person who manufactures, builds, rebuilds, fabricates, assembles, produces, programs, designs or otherwise makes modifications to any slot machine . . . *in this Commonwealth* for gaming purposes") (emphasis added); *id.* (defining "supplier" as a "person that sells, leases, offers or otherwise provides, distributes or services any slot machine . . . *in this Commonwealth*") (emphasis added).

use in this Commonwealth," not merely for the use of "licensed entities" at "licensed facilities."[161]

Perhaps most plainly illustrative of the Commonwealth Court's error is Section 1317.1 of the Gaming Act, which addresses the requirements for obtaining a license to manufacture slot machines. Section 1317.1(e)(1) provides: "*No person* may manufacture slot machines . . . or associated equipment *for use within this Commonwealth* unless the person has been issued the appropriate manufacturer license under this section."[162] On its face, this provision demonstrates a far greater breadth to the Gaming Act than the Commonwealth Court allowed. "No person" is much broader than "licensed entity." This provision also is not limited to a "licensed facility"; rather, its reach extends to "use within this Commonwealth." This language demonstrates that the Commonwealth Court patently erred in its insistence that the Gaming Act "only applies to licensed slot machines in licensed entities/facilities."[163]

The immediately following provision, Section 1317.1(e)(2), goes on to provide that, subject to an exception for training equipment, "*no person* may use slot machines . . . or associated equipment unless the slot machines . . . were manufactured by a person that has been issued the appropriate manufacturer license under this section."[164] Again, this broad provision applies to any "person," not just to a "licensed entity." A "person" who

---

[161] *See id.* (defining "manufacturer license" as a "license issued by the Pennsylvania Gaming Control Board authorizing a manufacturer to manufacture or produce slot machines . . . *for use in this Commonwealth* for gaming purposes") (emphasis added); *id.* (defining "supplier license" as a "license issued by the Pennsylvania Gaming Control Board authorizing a supplier to provide products or services related to slot machines . . . to slot machine licensees *for use in this Commonwealth* for gaming purposes") (emphasis added).

[162] 4 Pa.C.S. § 1317.1(e)(1) (emphasis added).

[163] *POM*, 221 A.3d at 733.

[164] 4 Pa.C.S. § 1317.1(e)(2) (emphasis added).

"uses" an unauthorized slot machine anywhere within this Commonwealth violates Section 1317.1(e)(2). This restriction is not in any way limited to "licensed facilities." These provisions of the Gaming Act directly contradict the *POM* court's declaration that "there is absolutely no suggestion . . . that the Gaming Act was intended to apply to the facilities where the POM Games are located, *e.g.*, taverns and social clubs, or that the Gaming Act regulates the placement of slot machines at such facilities."[165] *Au contraire*; numerous provisions do more than merely suggest such application.

Another such provision lies in Section 1518 of the Gaming Act. Although the *POM* court discussed certain provisions of Section 1518, ostensibly to demonstrate its applicability to "licensed entities" and "licensed facilities,"[166] that section also significantly undercuts the court's reasoning. Section 1518 sets forth numerous *criminal* offenses for violations of the Gaming Act. This observation, by itself, calls into doubt the rigid distinction that the *POM* and *Three Devices* courts drew between statutes that address legal gambling and those that concern illegal gambling.[167] Section 1518 of the Gaming Act indeed contains many provisions addressed to "licensed entities" and "licensed facilities," as the *POM* court highlighted. However, it also prohibits various acts committed by a "person,"[168] or a "licensed entity *or other person*."[169] Again, on its face, these provisions illustrate that the Gaming Act applies to more than merely "licensed entities," as the *POM* court suggested.

---

[165]     *POM*, 221 A.3d at 731.

[166]     *Id.* at 729, 732.

[167]     *See id.* at 726, 730; *Three Devices*, 306 A.3d at 440.

[168]     18 Pa.C.S. § 1518(a)(1), (a)(2), (a)(3.1), (a)(7.2), (a)(7.3), (a)(9), (a)(9.1).

[169]     *Id.* § 1518(a)(3), (a)(4), (a)(4.2), (a)(5) (emphasis added).

Of particular significance is Section 1518(a)(4). The Department contends that POM violates Section 1518(a)(4) regularly—indeed, as a core component of its business model. Given this provision's importance to the parties and to the *POM* court's rationale, we consider its language in some depth. Section 1518(a)(4) provides, in full:

> It shall be unlawful for any licensed entity or other person to manufacture, supply or place slot machines, table games, table game devices or associated equipment, authorized interactive game or interactive gaming devices or associated equipment into play or display slot machines, table games, table game devices or associated equipment on the premises of a licensed facility without the authority of the board.[170]

Again, we can take note of the fact that Section 1518(a)(4) applies to a "licensed entity *or other person*," which necessarily indicates that it applies to more than just licensed entities.[171] The *POM* court noted Section 1518(a)(4), but emphasized the words "on the premises of a licensed facility," which it understood as applying to each verb in the provision, *i.e.*, "manufacture," "supply," "place," and "display." It is largely from the *POM* court's interpretation of Section 1518(a)(4) that it court drew the conclusion that, although the Gaming Act "makes it unlawful to place slot machines on the premises of a licensed facility without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an unlicensed location."[172]

---

[170]   *Id.* § 1518(a)(4).

[171]   This observation may not be so obvious to POM, which quotes Section 1518(a)(4) in its brief, bolds the words "licensed entity" and "licensed facility" for emphasis, then argues that "plain language of this provision proscribes unlawful activity for licensed entities who manufacture, supply, or place slot machines or other enumerated games at licensed facilities without the Board's authority." *POM*, POM's Br. at 21-22. POM then concludes that "Section 1518 applies to licensed entities and facilities and does not purport to encompass POM Games and other skill games." *Id.* at 22. Contrary to POM's suggestion, placing the words "licensed entity" in boldface type does not make the words "or other person" disappear from the statute.

[172]   *POM*, 221 A.3d at 730 (emphasis omitted).

The text of Section 1518(a)(4) demands a different conclusion. The referenced devices—"slot machines, table games, table game devices or associated equipment"—are listed twice within Section 1518(a)(4), connected with different verbs. The word "or" also separates the list of verbs twice. The provision states that it is unlawful for any licensed entity or other person to "manufacture, supply, *or* place slot machines . . . into play *or* display slot machines . . . on the premises of a licensed facility without the authority of the board."[173] The structure of the provision, and the fact that "display" is significantly offset from the other verbs and separately tethered to the listed devices, indicates that "on the premises of a licensed facility" applies to "display." A contrary reading, moreover, would result in the nonsensical suggestion that the General Assembly intended to prohibit, for instance, the "manufacture" of slot machines "on the premises of a licensed facility," such as setting up a slot machine factory on the floor of a casino. The more straightforward reading of Section 1518(a)(4) is that it is unlawful to do all of the following without the authority of the Board: (1) manufacture slot machines; (2) supply slot machines; (3) place slot machines into play; or (4) display slot machines on the premises of a licensed facility.

As noted, the Department contends that POM violates Section 1518(a)(4) of the Gaming Act as a matter of course.[174] In analyzing this provision in some depth, our purpose is not to declare definitively whether POM is acting in violation of the criminal provisions of the Gaming Act. Rather, because Section 1518(a)(4) played a significant role in the *POM* court's erroneous understanding of the Gaming Act, the more significant point for present purposes is a broader one. Both Section 1518 and Section 1317.1(e)

---

[173]  4 Pa.C.S. § 1518(a)(4) (emphasis added).

[174]  *POM*, Department's Br. at 41 ("POM is in violation of Sections 1317.1(e)(1) and 1518(a)(4) because it is manufacturing and supplying slot machines without a license from the Board.").

provide ample evidence that the Commonwealth Court misapprehended the scope of the Gaming Act. The Gaming Act is not strictly limited to "licensed slot machines in licensed facilities."[175] There are numerous ways that unlicensed entities, such as POM, can violate provisions of the Gaming Act. The *POM* court's core holding was premised upon the court's misreading of fundamental aspects of the statutory scheme.

Although the *POM* court cited some other purported indicia of legislative intent, none rescue its holding from a finding of error. In discussing Section 1102 of the Gaming Act, the "legislative intent" provision, the *POM* court gave particular attention to Section 1102(8),[176] which, the court reasoned, "does not state that it is the General Assembly's intention to provide strict monitoring and enforced control over all gambling in the Commonwealth, whether legal or illegal, but merely that the General Assembly intended to strictly control the limited gaming authorized by the Gaming Act."[177] It is quite a stretch to reason that, because the General Assembly declared its intent to authorize only "limited gaming" and to strictly monitor and enforce control over that limited gaming through a licensing and regulatory scheme, that the General Assembly therefore intended gaming *outside* of licensed facilities to be an unregulated free-for-all. Such a conclusion also disregards the expressly stated "primary objective" of the Gaming Act "to which all other objectives and purposes are secondary," *i.e.*, "to protect the public through the regulation

---

[175]    *POM*, 221 A.3d at 731 (emphasis omitted).

[176]    4 Pa.C.S. § 1102(8) ("Strictly monitored and enforced control over all limited gaming authorized by this part shall be provided through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, practices, activities, licensees, permittees, registrants and certificate holders.").

[177]    *POM*, 221 A.3d at 732 (emphasis omitted).

and policing of all activities involving gaming and practices that continue to be unlawful."[178]

The *POM* court additionally sought to glean some indication of legislative intent through its assessment of the available categories of slot machine licenses. Because such licenses are available only to large, well-capitalized ventures like "racetracks, casinos, hotels, and established resort hotels," the *POM* court opined that the Gaming Act's "intent was to provide licenses to large, individual slot machine operations that raise millions of dollars in revenue," but not to regulate "the placement of slot machines" at small business establishments or social clubs.[179] The court's conclusion in this regard was not derived from any text of the Gaming Act, but rather only from what the court identified as commonalities among the entities that qualify for slot machine licenses. Such reasoning also constitutes another variation of the absurd suggestion that one is free to engage in a licensed activity without a license because, so long as one does *not* have a license, he is not subject to the law governing licensing. The conclusion that the *POM* court drew is not only in tension with the expressly declared intent of the General Assembly to authorize only "limited gaming" and to regulate and police "all activities involving gaming,"[180] but it is also, as we have seen above, contrary to the plain language of Sections 1317.1(e) and 1518(a)(4) of the Gaming Act, which do, in fact, address the placement of illegal slot machines in unlicensed facilities.

The *POM* court's resort to legislative history fares no better. The court gave particular weight to a floor statement of a sponsor of Act 42 of 2017 who, when challenged that the bill would make "skill games" illegal, stated that he did not "believe" that would be

---

[178]    4 Pa.C.S. § 1102(1).

[179]    *POM*, 221 A.3d at 731.

[180]    4 Pa.C.S. § 1102(1), (2), (3), (3.1), (3.2), (4), (5), (6), (7), (8), (13).

the case.[181]  It goes without saying that the floor statements of individual legislators are not the text of a statute, and they are not on a par with the text.  It is the language of the statute that governs, not the impressions of any individual legislators.  This remains true whether the cited legislator sponsored the bill, voted in favor of or against it, or otherwise.  We might just as easily rely upon the view of the other cited legislator who—no doubt referring to the definitions of "skill slot machine" and "hybrid slot machine" in Act 42 of 2017—stated that he "believes that the language in this bill will make illegal all games of skill" throughout Pennsylvania.[182]  Cherry-picking of this sort adds little to the interpretive endeavor, and the Commonwealth Court's emphasis upon the isolated comment of Representative Ortitay is a quintessential example of "looking out over the cocktail party for one's friends."[183]

Finally, the *POM* court's discussion of whether the Gaming Act "supersedes" Section 5513 of the Crimes Code, and its corollary discussion of the presumption against the implied repeal of statutes, wholly missed the mark.[184]  The Commonwealth Court stated that it found this analysis necessary because it needed to determine whether the Gaming Act was meant to regulate both "legal" and "illegal" gambling.[185]  This was a false choice.  First of all, as discussed above, the Gaming Act does, indeed, regulate "illegal" gambling activities in numerous respects.  Such regulation takes one particularly obvious

---

[181]    *See POM*, 221 A.3d at 734.

[182]    *Id.*

[183]    *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

[184]    *See POM*, 221 A.3d at 735-36.

[185]    *Id.* at 736.

form in the articulation of dozens of *criminal* offenses in Section 1518.[186]  In any event, determining that POM and its "skill game" devices are subject to regulation under the Gaming Act does not in any way necessitate a conclusion that the Gaming Act "supersedes" or "impliedly repealed" Section 5513 of the Crimes Code.[187]  As discussed at length above, the Gaming Act and Section 5513 work together as a unified scheme, made clear by their express references to each other.[188]  Activities that are "lawfully conducted" under the Gaming Act are excluded from the criminal prohibitions of Section 5513, and, therefore, gambling activities that are *not* lawful under the Gaming Act remain subject to Section 5513.[189]  We need not consult any judicial presumptions or hunt for indicia of the General Assembly's intent in this regard.  The General Assembly stated its intent clearly.

In sum, the Commonwealth Court's statutory interpretation was flawed in both *POM* and in *Three Devices*.  The Gaming Act and Section 5513 of the Crimes Code are not unrelated statutes dealing with the separate universes of "legal" and "illegal" gambling.  The Gaming Act facially addresses far more than merely the lawful activities of "licensed entities" at "licensed facilities" and, indeed, contains many of its own proscriptions of various unlicensed activities.  In addition, the Gaming Act works alongside Section 5513 of the Crimes Code to carve out activities that otherwise would be prohibited by the latter.  This also means that a "slot machine" as defined in the Gaming Act is the very same "slot machine" that is referenced in Section 5513(a)(1) of the Crimes Code.  Most importantly for present purposes, after Act 42 of 2017, that includes a "skill slot machine" and a "hybrid

---

[186]    *See generally* 4 Pa.C.S. § 1518.

[187]    *POM*, 221 A.3d at 736.

[188]    *See* 4 Pa.C.S. § 1903(a)(2); 18 Pa.C.S. § 5513(e.1)(4).

[189]    18 Pa.C.S. § 5513(e.1)(4).

slot machine," the definitions of which render irrelevant any distinction between skill and chance in the operation of the device. That, in turn, removes the predominant factor test from our inquiry, for that test does not determine whether a device is a "slot machine."

### B. Appellees' Arguments

The Appellees' arguments to the contrary are unavailing. In its best argument against the application of the Gaming Act, POM contends that its device does not constitute a "slot machine" due to limiting language in the Gaming Act's definition of that term: "approved by the Pennsylvania Gaming Control Board." In relevant part, a "slot machine" is defined as including "[a]ny mechanical, electrical or computerized contrivance, terminal, machine or other device *approved by the Pennsylvania Gaming Control Board* which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever," allows a person to operate it and, whether by chance or skill, may entitle the person to a reward, and which may or may not exhibit certain other features.[190] On POM's reading of this definition, a device does not become a "slot machine" *until* it is "approved" by the Board. The Department contends that it is unreasonable to conclude that the "Board's blessing" is what transforms a device into a "slot machine," but POM argues that "the 'Board's blessing' is precisely what is required to turn a game into a 'slot machine.'"[191]

To the extent that POM suggests that the "approved by" the Board qualifier applies to all of the listed objects, *i.e.*, "contrivance," "terminal," "machine," and "device," POM presents a plausible reading of the definition. There is, however, an arguably more natural reading: the "approved by" qualifier applies only to the immediately preceding noun, *i.e.*, "other device." On this reading, the definition would apply to a "mechanical,

---

[190]    4 Pa.C.S. § 1103 (defining "slot machine") (emphasis added).

[191]    *POM*, POM's Br. at 25 (quoting Department's Br. at 30) (emphasis omitted).

electrical, or computerized contrivance, terminal, machine," or to an "other device approved by the Pennsylvania Gaming Control Board." To compare the outcomes, on POM's reading, its device meets every other element of the definition, but it is not a "slot machine" because it has not been "approved by" the Board. On the alternative reading, the POM device is a "computerized" "terminal" or "machine" that otherwise meets all the elements of the definition, and thus is a "slot machine" (or an included subset of slot machine, *i.e.*, a "skill slot machine" or "hybrid slot machine," depending on how one views the relative roles of skill and chance).

Because one can read the definition POM's way, we will grant that the definition is at least arguably ambiguous in this regard.[192] As such, we may employ all of our canons of statutory construction in discerning the legislative intent behind this definition. First, however, is a question of grammar.[193] The dispute over the reach of the qualifying phrase—"approved by" the Board—presents a clash between the "series-qualifier" rule and the "last-antecedent" rule. Under the series-qualifier rule, where there is a series of nouns followed by a modifier, the "modifier at the end of the list 'normally applies to the entire series.'"[194] The dueling rule, the last-antecedent rule, provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."[195] These rules plainly are in tension. To borrow Professor

---

[192] *See A.S. v. Pennsylvania State Police*, 143 A.3d 896, 905-06 (Pa. 2016) ("A statute is ambiguous when there are at least two reasonable interpretations of the text.").

[193] *See* 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . .").

[194] *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021) (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012) ("SCALIA & GARNER")); *see also Commonwealth v. Yard*, 323 A.3d 762, 790 (Pa. 2024) (Donohue, J., dissenting) (discussing series-qualifier rule).

[195] *Facebook*, 592 U.S. at 404 (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Yard*, 323 A.3d at 774 (Wecht, J., concurring) (discussing last-antecedent rule).

Llewellyn's fencing analogy for canons of statutory construction, these linguistic rules provide something of a "thrust" and "parry" to each other.[196]  As always, then, it is wise not to be dogmatic in one's approach to such rules.  They are "useful tools, but it is important to keep their limitations in mind."[197]

This is not to say, however, that these grammatical principles tell us nothing.  It is noteworthy, for instance, that there is no punctuation between "other device" and "approved by" the Board; the qualifying phrase flows smoothly from "other device" with no intervening comma.  As the United States Supreme Court has explained, "several leading treatises" provide that a "qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one."[198]  Because such is not the case here, we lean toward the "well-established cannon of construction that courts should generally apply qualifying words or phrases to the words immediately preceding them," *i.e.*, the last-antecedent rule.[199]

---

[196]     Karl N. Llwellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about how Statutes are to be Construed*, 3 VAND. L. REV. 395, 401-06 (1950) (describing each canon of statutory construction as a "thrust," with an opposing canon serving as a "parry").

[197]     *Facebook*, 592 U.S. at 410 (Alito, J., concurring); *see id.* at 411 (quoting SCALIA & GARNER at 150) ("Perhaps more than most of the other canons, [the series-qualifier canon] is highly sensitive to context.  Often the sense of the matter prevails:  'He went forth and wept bitterly' does not suggest that he went forth bitterly.") (bracketed material in original; quotation marks modified); *see also Yard*, 323 A.3d at 774 (Wecht, J., concurring) (applying the last-antecedent rule, but noting that the rule "is not an inexorable command").

[198]     *Facebook*, 592 U.S. at 403-04 (citing W. ESKRIDGE, INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67-68 (2016); 2A N. SINGER & S. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:33, 499-500 (rev. 7th ed. 2014); SCALIA & GARNER 161-162).

[199]     *Commonwealth v. Packer*, 798 A.2d 192, 198 (Pa. 2002); *see id.* (quoting *John Hancock Prop. & Cas. Ins. Co. v. Commonwealth Ins. Dep't.*, 554 A.2d 618, 621-22 (Pa. (continued…)

More important than any technical grammatical guideline, however, is the fact that POM's construction presents numerous other problems from a statutory construction standpoint. To conclude that a "slot machine" is not a "slot machine" until is approved by the Gaming Control Board produces a litany of incongruities and circularities that are not presented by the alternative, more natural reading of the definition. To revisit Section 1317.1(e)(1) of the Gaming Act—"No person may manufacture slot machines . . . for use within this Commonwealth unless the person has been issued the appropriate manufacturer license under this section"[200]—it becomes unclear, under POM's reading, how one might violate this provision. As the Department observes, under POM's reading, Section 1317.1(e)(1) would provide something like "no person may manufacture a Board-approved slot machine without the approval of the Board"—an interpretation that renders the provision a "redundant nullity."[201] Similar circularity pervades definitions like the "conduct of gaming," which the Gaming Act defines as the "licensed placement, operation and play of slot machines . . . as authorized and approved by the Pennsylvania Gaming Control Board."[202] If "slot machines" must be "approved by" the Board in order to be "slot machines," as POM insists, then the "approved by" the Board language in this definition is redundant.

---

Cmwlth. 1989)) ("Qualifying words 'do not extend to or include other words, phrases, or clauses more remote, unless such extension or inclusion is clearly required by the intent or meaning of the context or disclosed by an examination of the entire act.'").

[200]    4 Pa.C.S. § 1317.1(e)(1).

[201]    *POM*, Department's Br. at 31.

[202]    4 Pa.C.S. § 1103 (defining "conduct of gaming").

Perhaps most significantly, POM's interpretation of the definition of "slot machine" embraces an absurd result.[203] On POM's reading, a device that is one-hundred percent identical to a "slot machine" in every way is wholly exempt from the entire regulatory structure established by the Gaming Act merely because its manufacturer elects *not* to obtain the Gaming Control Board's approval. Why, one might ask, would a person subject himself to the burdens of regulatory compliance and oversight when the alternative, purportedly, is simply to decline to comply with the law? This suggestion threatens to render the entire Gaming Act ineffective,[204] at least as it concerns slot machines. One would have to "opt in" to the application of the Gaming Act by seeking out the Board's approval, which would be a rather foolish economic choice if the "Wild West" of unlicensed and unregulated gambling is an available alternative. Moreover, this interpretation would require us to presume that the General Assembly intended to favor the private interest— POM's interest, in particular—over the public interest.[205] Under POM's view, the legislature intended to approve a state of affairs in which something identical to gambling with slot machines pervades all corners of this Commonwealth, but without the heightened tax rate on slot machine revenue, without the funds raised through the hefty licensing fees, and without any of the regulatory controls or consumer protection requirements that attend the operation of slot machines in licensed facilities.[206] There is

---

[203] *See* 1 Pa.C.S. § 1922(1) (directing courts to presume that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable").

[204] *See id.* § 1922(2) (directing courts to presume that "the General Assembly intends the entire statute to be effective and certain").

[205] *See id.* § 1922(5) (directing courts to presume that "the General Assembly intends to favor the public interest as against any private interest").

[206] *See supra* n.58 (concerning the heightened tax rate on slot machine revenue); n.51 (concerning the cost to obtain a slot machine license); *Better Bets Ventures*, 332 A.3d at 1213-14 (detailing the Gaming Control Board's concerns that "skill games" lack regulatory controls that "require licensees to prevent minors from using gaming devices, (continued…)

no indication that this is the case. Indeed, all evidence points to the contrary, particularly given the General Assembly's specific choice in Act 42 of 2017 to include a "skill slot machine" and "hybrid slot machine" within the definition of a "slot machine," *i.e.*, to place devices such as POM's within the regulatory framework of the Gaming Act.

For all of these reasons, we do not agree with POM that the Gaming Control Board's approval is the *sine qua non* of a "slot machine" under the Gaming Act. Rather, the better reading is the more straightforward one: the qualifying phrase applies to its last antecedent, *i.e.*, "or other device approved by the Pennsylvania Gaming Control Board." The POM device qualifies as a slot machine because it is a "computerized . . . machine" that meets all of the other elements that define a "slot machine." At best, depending upon how one assesses the relative role of skill or chance as "the predominant factor in affecting the outcome of the game," then the device may be deemed a "skill slot machine" or "hybrid slot machine" after Act 42 of 2017, both of which, in turn, are defined as a "slot machine."[207] POM's lead argument on this score fails.

The Appellees in *Three Devices* advance a similar linguistic argument concerning the scope of Section 5513(a)(1) of the Crimes Code, but it fares no better. Where Section 5513(a)(1) applies to "any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards,"[208] the Appellees contend that the phrase "to be used for gambling purposes" applies to each item in the list, such that the Commonwealth would need to prove that a seized device is a "slot machine . . . *to be*

---

impose minimum pay-out percentages, require approval of site plans to ensure the adequacy of security and surveillance measures, create requirements for advertising of the games, and require the posting of signs containing a toll-free telephone number for help with compulsive and problem gambling.").

[207]    4 Pa.C.S. § 1103 (defining "slot machine," "skill slot machine," and "hybrid slot machine").

[208]    18 Pa.C.S. § 5513(a)(1).

*used for gambling purposes.*"[209]  Because the Appellees insist that the POM device is not used for "gambling" due to their view of the predominant factor test,[210] they contend that Section 5513(a)(1) does not apply to the POM device.  This argument requires less analysis.  The Appellees' proposed construction requires a particularly unintuitive reading of the text.  Again, as discussed above concerning the use of the last-antecedent rule versus the series-qualifier rule, there is no comma between "device" and "to be used for gambling purposes," as would suggest the application of the qualifying phrase to all of the preceding nouns.  Absent the qualifying phrase, moreover, the provision addresses a "punch board," "drawing card," "slot machine," and a "device."  Yet, all of the preceding objects are devices, making it unclear why they would be listed separately.  It is only when the qualifying phrase "to be used for gambling purposes" is attached to "any device" that the latter obtains a meaning that makes sense alongside the preceding list of gambling devices.  The Appellees' reading also fails to account for the carveout for "playing cards." A "slot machine . . . to be used for gambling purposes, except playing cards" is inscrutable; "any device to be used for gambling purposes, except playing cards" makes perfect sense.  As a whole, the only reasonable reading of this provision is that "any device to be used for gambling purposes" is a catch-all term expanding upon the preceding list of enumerated items, as we commonly see throughout many statutes.[211]

---

[209]  *See Three Devices*, Appellees' Br. at 62-65.

[210]  *See id.* at 36-40; *accord POM*, POM's Br. at 30 (asserting that "the POM Game does **not** involve gambling") (bold emphasis in original).

[211]  *See* 1 Pa.C.S. § 1903(b) ("General words shall be construed to take their meanings and be restricted by preceding particular words."); *see also ejusdem generis*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.").

It is here that Justice Donohue departs from our analysis. Justice Donohue stresses that the forfeiture provision, Section 5513(b), applies to any "*gambling device possessed or used in violation of the provisions of subsection (a),*"[212] which, in her view, means that a device that constitutes a "slot machine" for purposes of Section 5513(a)(1) is subject to forfeiture only if it is separately determined to be "used for gambling purposes," which requires the application of the predominant factor test.[213] Although we do not take issue with Justice Donohue's application of the predominant factor test, we nonetheless do not agree with Justice Donohue's statutory analysis for several reasons.

First, the more straightforward reading of Section 5513(b) is simply that the forfeiture provision applies to devices that violate Section 5513(a)—that are "possessed or used in violation of" Section 5513(a). That is, the items listed in Section 5513(a)(1) *are* the "gambling devices" that are referenced in Section 5513(b). More importantly, as it concerns "slot machines" specifically, there is no need for an additional analysis under the predominant factor test because, as we have explained, the predominant factor test was incorporated into (and effectively made irrelevant by) the Gaming Act's definition of a "slot machine," via Act 42's additions of a "skill slot machine" and "hybrid slot machine" into that definition.[214] Moreover, the "slot machine" definition already encompasses the

---

[212]    18 Pa.C.S. § 5513(b) (emphasis added).

[213]    *Id.* § 5513(a).

[214]    *See supra* n.55 and accompanying text. Justice Donohue suggests that, if the General Assembly intended to eliminate the predominant factor test, "it would have done so expressly by amending the Crimes Code to eliminate the consideration of chance from the definition of a 'gambling device' established in this Court's precedent. Conc. Op. (Donohue, J.) at 22. Justice Donohue's suggestion is not the only way to achieve such ends. The General Assembly *did* expressly "eliminate the consideration of chance" from the definition of a "slot machine." It included a "skill slot machine" and a "hybrid slot machine" into the definition in the Gaming Act, which render irrelevant any consideration of the distinction between skill and chance. *See* 4 Pa.C.S. § 1103 (defining a "skill slot machine" as a "slot machine in which the skill of the player, rather than the element of (continued…)

other elements of gambling, *i.e.*, consideration and reward.[215]  Thus, a "slot machine" for purposes of Section 5513(a)—which is the same "slot machine" defined in the Gaming Act—is indeed "used for gambling purposes."  Such devices are regulated by the Gaming Act precisely because they are used for gambling purposes.

Notably, Justice Donohue agrees that the term "slot machine" in Section 5513(a) must be understood by reference to the definition of a "slot machine" in the Gaming Act. Justice Donohue's position nonetheless depends upon the idea that there is some subset of "slot machines" that are *not* used for gambling, and that the predominant factor test is therefore necessary to distinguish between those used for gambling and "those that are innocuous."[216]  Setting aside that the "slot machines" defined in the Gaming Act are used for gambling, Justice Donohue's position is largely premised upon a dictionary definition from 1927 that does not reference gambling.[217]  If we are to disregard the definition in the Gaming Act and look to common meaning, we might just as well use the Commonwealth Court's dictionary definition in *Three Devices*, *i.e.*, "a coin-operated *gambling machine*

---

chance, is the *predominant factor* in affecting the outcome of the game," and a "hybrid slot machine" as a "slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game") (emphasis added).

[215]  *See supra* n.54 and accompanying text.  The "slot machine" definition in the Gaming Act incorporates the elements of "consideration," *i.e.*, the "insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever," and "reward," *i.e.*, that the machine may entitle the player to "receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever."  4 Pa.C.S. § 1103 (defining "slot machine").

[216]  Conc. Op. (Donohue, J.) at 20.

[217]  *See id.* at 8 (quoting WEBSTER'S COLLEGIATE DICTIONARY (3d. ed. 1927)) (asserting that a "slot machine" in 1925 was understood as "a machine the operation of which is started by dropping a coin into a slot").

that pays off according to the matching of symbols on wheels spun by a handle."[218] That definition is far closer to what one commonly understands a "slot machine" to be.

It remains that the most straightforward construction of Section 5513 is that the specific devices listed in Section 5513(a)(1)—"punch board," "drawing card," and "slot machine"—are "gambling devices," and the phrase "any device to be used for gambling purposes" is a catch-all provision meant to expand upon the list of enumerated devices. To the extent that Justice Donohue is concerned with other uses of items such as punch boards and drawing cards, it very well might be the case that such uses are encompassed within the Local Option Small Games of Chance Act, which Section 5513(e.1) exempts from the prohibitions of the Crimes Code.[219] Such matters, however, are well beyond the scope of the instant appeals. With regard to other devices that lack a specific statutory definition, the predominant factor test may well be necessary to assess their nature. But as it concerns a "slot machine," the General Assembly has dispensed with that inquiry through the definition that it provided in the Gaming Act.

Finally, the Appellees in both *POM* and *Three Devices* argue that, if the POM device is found to be a "slot machine" under the definition in the Gaming Act, and thus for purposes of Section 5513, then "all ordinary ticket-generating games at amusement businesses like Dave & Busters, Chuck E. Cheese, or the local community fair would be illegal."[220] This is a "slippery slope" argument that the Commonwealth calls the "Chuck E. Cheese defense."[221] It is worth noting that this Court in *Commonwealth v. Irwin* found

---

[218]   *Three Devices*, 306 A.3d at 440 (emphasis added).

[219]   *See* 18 Pa.C.S. § 5513(e.1)(3); *see also* 10 P.S. § 328.103 (including "[p]unchboards, daily drawings, weekly drawings, 50/50 drawings" within the definition of approved "games of chance" under the Local Option Small Games of Chance Act).

[220]   *POM*, POM's Br. at 39 (spelling of "Chuck E. Cheese" corrected).

[221]   *POM*, Department's Reply Br. at 19.

that similar devices at a pizza shop that awarded tokens to be exchanged for children's prizes did not constitute gambling devices *per se*, given that the prizes were always worth less than the cost of play and thus the "reward" element of gambling was absent.[222] Nonetheless, the Appellees' point is that, under the definition of a "slot machine" in the Gaming Act, the reward component includes "merchandise or anything of value whatsoever,"[223] and thus, as a theoretical matter, this sort of amusement device may qualify. The point is well-taken. It also bears emphasis that the POM device does not merely award tokens to be exchanged for toys or trinkets. Despite its euphemistic name, the "Pennsylvania Skill Amusement Device" plainly is not purely for entertainment. It is not a game for children to win prizes. Its *raison d'être* is to take the money of those who risk it in the hope of winning more money. POM may not wish to call that "gambling," but one cannot help but notice that its device is rather unlike those at Chuck E. Cheese.

In any event, should the Appellees' warning actually come to fruition as a consequence of the General Assembly's words, then so be it. We cannot shy away from the language of a statute merely because its application may have undesirable consequences in some hypothetical future context. Should law enforcement officers begin conducting raids of children's amusement establishments and seizing Skee-Ball machines and stuffed animals, our courts are equipped to consider legal challenges to such actions at that juncture. And of course, if the General Assembly determines that the threat of this possibility is of sufficient magnitude, it remains free to amend the relevant statutes to provide further for such innocuous activity, as other jurisdictions have done.[224]

---

[222] *Commonwealth v. Irwin*, 636 A.2d 1106, 1107-08 (Pa. 1993).

[223] 4 Pa.C.S. § 1103 (defining "slot machine").

[224] *See POM*, Department's Reply Br. at 21-22 (citing *Ex Parte Ted's Game Enterprises*, 893 So.2d 376, 381 (Ala. 2004) (discussing Alabama's "Chuck E. Cheese Law," Ala. Code 1975, § 13A-12-76, which exempts from gambling statutes certain (continued…)

In other respects, the Appellees' arguments either are directed to the predominant factor test, which is immaterial to a "slot machine," or they echo the reasoning of the Commonwealth Court, which we already have found to lack merit.

### V. Conclusion and Mandate

The legal analysis in these appeals distills to a few straightforward points. A "slot machine" in Section 5513(a)(1) of the Crimes Code is not some wholly distinct object unrelated to the "slot machine" that is defined in the Gaming Act. Rather, Section 5513 tells us to look to the Gaming Act to determine what activities are "lawfully conducted" thereunder, such that they are, *ipso facto*, not unlawful under the Crimes Code either.[225] The Gaming Act, in turn, addresses many different activities relating to "slot machines," and it specifically provides for those that are lawful and those that are unlawful, *i.e.*, both legal and illegal gambling. One statute is not in tension with the other, and neither is "inconsistent with"[226] the other. They do not relate to a different class of things. The statutes work together. The Gaming Act provides for the "limited gaming"[227] that otherwise would be prohibited by Section 5513, and activities involving a "slot machine" that are not lawfully operated under the Gaming Act remain subject to Section 5513 of the Crimes Code. This is a perfectly intelligible, straightforward statutory scheme.

---

devices that award "noncash merchandise, prizes, toys, gift certificates, or novelties"); *City of Forth Worth v. Rylie*, 649 S.W.3d 246, 252 (Tex. 2022) (discussing the "fuzzy animal exception" to Texas gambling law, Texas Penal Code § 47.01(4)(B))). Notably, the General Assembly already has exempted the State Lottery, bingo games, and certain small games of chance from the prohibitions of Section 5513 of the Crimes Code, *see* 18 Pa.C.S. § 5513(e.1)(1)-(3), and there is nothing that would prevent the legislature, should it see fit, from providing similarly for the sort of games that one may find at Chuck E. Cheese.

[225] 18 Pa.C.S. § 5513(e.1)(4).

[226] 4 Pa.C.S. § 1903(a)(2).

[227] *See generally* 4 Pa.C.S. § 1102 (articulating the General Assembly's intent in the Gaming Act).

Is the POM device a slot machine? Several times over. First, the device meets the general definition of a "slot machine" in the Gaming Act, and it always has.[228] Second, especially after Act 42 of 2017 added two new terms to the definition of "slot machine" that specifically address the "skill" aspect of the device, the POM device—which for its entire legal existence depends upon its minor "skill" component—is also plainly either a "skill slot machine" or a "hybrid slot machine."[229] Take your pick. These conclusions are necessitated by the unambiguous language of the Gaming Act, and not any judicial interpretation of otherwise undefined terms. But even setting aside the plain language of the statutes and resorting instead to a judicial gloss, the POM device is a "slot machine" for a yet a third reason—it meets the Commonwealth Court's common-meaning, ordinary-English definition: "a coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle," or an electronic version of such a device.[230] This definition describes the POM device with precision.

Nonetheless, one might, as the Commonwealth Court did, insist that the device is not a "slot machine" because there is some "skill" component of the gameplay (or at least there can be, hypothetically). But this is merely to invoke the predominant factor test. The new definitions of "skill slot machine" and "hybrid slot machine" plainly eliminate the predominant factor test for any device that otherwise constitutes a "slot machine." No amount of skill, chance, or any combination thereof will remove a device from the ambit

---

[228]  *See POM*, 221 A.3d at 725 (holding that POM's "skill game" device meets the definition of "slot machine" and "skill slot machine" in the Gaming Act, and that POM meets the definition of a "manufacturer" and a "supplier" of slot machines).

[229]  *See* 4 Pa.C.S. § 1103 (defining "skill slot machine" as a "slot machine in which the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game," and a "hybrid slot machine" as a "slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game").

[230]  *Three Devices*, 306 A.3d at 440.

of a "slot machine" after Act 42 of 2017. Thus, although the parties expend much of their advocacy on the supposed subtleties of the predominant factor test, we need not apply it to the POM device. That inquiry would make sense if we needed to determine whether the device constitutes a gambling device in the abstract, such that it falls into Section 5513(a)(1)'s general clause—"device to be used for gambling purposes."[231] We need not conduct that inquiry. The device is a "slot machine."

These straightforward conclusions are sufficient to establish the reversible errors of the Commonwealth Court in both *POM* and *Three Devices*.[232] The orders of the Commonwealth Court are reversed, and the matters are remanded for further proceedings consistent with this opinion.

This order is stayed for 120 days.

Chief Justice Todd and Justice McCaffery join the opinion. Justices Mundy and Brobson join the opinion with respect to the appeal at 50 MAP 2024.

Justice Donohue files a concurring opinion, concurring in the result.

---

[231]    18 Pa.C.S. § 5513(a)(1).

[232]    We respectfully differ with Justice Brobson's suggestion to affirm the Commonwealth Court's order in *POM* on narrower grounds. Justice Brobson observes that one component of the Department of Revenue's counterclaim sought to preclude POM from engaging in further sales and distribution of its devices unless it could obtain the appropriate licenses, but "manufacturer" and "supplier" licenses under the Gaming Act are not available to entities that "seek to facilitate illegal gaming in the Commonwealth by placing their machines in unlicensed facilities." Conc. and Diss. Op. (Brobson, J.) at 5. Thus, Justice Brobson would conclude that the Department was not entitled to its requested relief "to the extent that request was premised on the theory" that POM was required to obtain a slot machine manufacturer and/or supplier license. *Id.* As we understand the Department's position, the Department never suggested that POM *could* obtain the required licenses under the Gaming Act. Rather, the Department highlighted the unlicensed nature of POM's conduct in order to emphasize POM's failure to comply with the Gaming Act. Justice Brobson stresses that POM is not eligible for manufacturer or supplier licenses in the first place, but this simply further illustrates that POM's activities are unlawful under the Gaming Act, which was exactly what the Department's counterclaim sought to establish.

Justice Brobson files a concurring and dissenting opinion in which Justice Mundy joins.

Justice Dougherty did not participate in the argument or decision of these matters.